# UNITED STATES *v.* NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC., ET AL.

No. 73-1701.   Argued March 17, 1975—Decided June 26, 1975

*Gerald P. Norton* argued the cause for the United States. With him on the briefs were *Solicitor General Bork, Assistant Attorney General Kauper, Howard E. Shapiro,* and *Daniel R. Hunter.*

*Lee Loevinger* argued the cause for appellees. With him on the brief for appellees Bache & Co., Inc., et al., were *Owen M. Johnson, Jr.,* and *David J. Saylor.* Briefs were filed by *Joseph B. Levin, Lloyd J. Derrickson,* and

*Dennis C. Hensley* for appellee National Association of Securities Dealers, Inc.; by *Robert E. Jensen* and *Richard M. Phillips* for appellees Wellington Management Co. et al.; by *William R. Meagher* for appellees Fidelity Fund, Inc., et al.; by *Herbert J. Miller, Jr.,* for appellee Vance, Sanders & Co., Inc.; and by *Marvin Schwartz* and *Mark I. Fishman* for appellee Massachusetts Investors Growth Stock Fund, Inc.

*Walter P. North* argued the cause for the Securities and Exchange Commission as *amicus curiae* urging affirmance. With him on the brief was *Lawrence E. Nerheim.*

Opinion of the Court by MR. JUSTICE POWELL, announced by MR. JUSTICE BLACKMUN.

This appeal requires the Court to determine the extent to which the regulatory authority conferred upon the Securities and Exchange Commission by the Maloney Act, 52 Stat. 1070, as amended, 15 U. S. C. § 78*o*–3, and the Investment Company Act of 1940, 54 Stat. 789, as amended, 15 U. S. C. § 80a–1 *et seq.,* displaces the strong antitrust policy embodied in § 1 of the Sherman Act, 26 Stat. 209, as amended, 15 U. S. C. § 1. At issue is whether certain sales and distribution practices employed in marketing securities of open-end management companies, popularly referred to as "mutual funds," are immune from antitrust liability. We conclude that they are, and accordingly affirm the judgment of the District Court.

I

An "investment company" invests in the securities of other corporations and issues securities of its own.[1]

---

[1] The Investment Company Act of 1940 defines "investment company" to include any issuer of securities which

"(1) is or holds itself out as being engaged primarily, or pro-

Shares in an investment company thus represent proportionate interests in its investment portfolio, and their value fluctuates in relation to the changes in the value of the securities it owns. The most common form of investment company, the "open end" company or mutual fund, is required by law to redeem its securities on demand at a price approximating their proportionate share of the fund's net asset value at the time of redemption.[2]  In order to avoid liquidation through redemption, mutual funds continuously issue and sell new shares.  These features—continuous and unlimited distribution and compulsory redemption—are, as the Court recently recognized, "unique characteristic[s]" of this form of investment.  *United States* v. *Cartwright,* 411 U. S. 546, 547 (1973).

The initial distribution of mutual-fund shares is conducted by a principal underwriter, often an affiliate of

---

poses to engage primarily, in the business of investing, reinvesting, or trading in securities;

"(2) is engaged or proposes to engage in the business of issuing face-amount certificates of the installment type, or has been engaged in such business and has any such certificate outstanding; or

"(3) is engaged or proposes to engage in the business of investing, reinvesting, owning, holding, or trading in securities, and owns or proposes to acquire investment securities having a value exceeding 40 per centum of the value of such issuer's total assets (exclusive of Government securities and cash items) on an unconsolidated basis." 15 U. S. C. § 80a-3 (a).

This broad definition is qualified, however, by a series of specific exemptions.  See §§ 83a-3 (b) and (c).

[2] See 15 U. S. C. §§ 80a-2 (a) (32), 80a-22 (e).

Management investment companies whose securities lack this redeemability feature are defined as "closed end" companies, § 80a-5, and their sales and distribution practices are regulated under § 23 of the Act.  15 U. S. C. § 80a-23.  Section 22 of the Act, the provision under consideration in this appeal, governs the sales and distribution practices of "open end" companies only.

the fund, and by broker-dealers [3] who contract with that underwriter to sell the securities to the public. The sales price commonly consists of two components, a sum calculated from the net asset value of the fund at the time of purchase, and a "load," a sales charge representing a fixed percentage of the net asset value. The load is divided between the principal underwriter and the broker-dealers, compensating them for their sales efforts.[4]

The distribution-redemption system constitutes the primary market in mutual-fund shares, the operation of which is not questioned in this litigation. The parties agree that § 22 (d) of the Investment Company Act requires broker-dealers to maintain a uniform price in sales in this primary market to all purchasers except the fund, its underwriters, and other dealers. And in view of this express requirement no question exists that antitrust immunity must be afforded these sales. This case

---

[3] In this opinion we will use the term "broker-dealer" to refer generally to persons registered under the Securities Exchange Act of 1934, 48 Stat. 895, 15 U. S. C. § 78o et seq., and authorized to effect transactions or induce the purchase or sale of securities pursuant to the authorization of that Act. We also will refer separately to "brokers" and "dealers" as defined by the Investment Company Act, see 15 U. S. C. §§ 80a–2 (a) (6) and (11), to describe the capacity in which a broker-dealer acts in a particular transaction.

[4] The Act defines "sales load" to be the difference between the public offering price and the portion of the sales proceeds that is invested or held for investment purposes by the issuer. § 80a–2 (a) (35). Most mutual funds charge this sales load in order to encourage vigorous sales efforts on the part of underwriters and broker-dealers. There are some funds that do not charge this additional sales fee. These "no load" funds generally sell directly to the investor without relying on the promotional and sales efforts of underwriters and broker-dealers. See SEC Report of the Division of Investment Management Regulation, Mutual Fund Distribution and Section 22 (d) of the Investment Company Act of 1940, p. 112 (Aug. 1974) (hereinafter 1974 Staff Report).

focuses, rather, on the potential secondary market in mutual-fund shares.

Although a significant secondary market existed prior to enactment of the Investment Company Act, little presently remains. The United States agrees that the Act was designed to restrict most of secondary market trading, but nonetheless contends that certain industry practices have extended the statutory limitation beyond its proper boundaries. The complaint in this action alleges that the defendants, appellees herein, combined and agreed to restrict the sale and fix the resale prices of mutual-fund shares in secondary market transactions between dealers, from an investor to a dealer, and between investors through brokered transactions.[5] Named as defendants are the National Association of Securities Dealers (NASD),[6] and certain mutual funds,[7] mutual-fund underwriters,[8] and securities broker-dealers.[9]

---

[5] Two additional private antitrust actions premised on similar theories were filed in the District Court and subsequently dismissed, *Haddad* v. *Crosby Corp.* and *Gross* v. *National Assn. of Securities Dealers, Inc.*, 374 F. Supp. 95 (DC 1973). The Court of Appeals for the District of Columbia Circuit stayed those appeals to await the resolution of this case, and the petition of one of the parties for certiorari before judgment was denied, *Gross* v. *National Assn. of Securities Dealers, Inc.*, 419 U. S. 843 (1974).

Subsequent to the filing of the United States' complaint some 50 private suits purporting to be class actions under Fed. Rule Civ. Proc. 23 were filed in various District Courts around the country. These cases were transferred to the United States District Court for the District of Columbia by the Judicial Panel on Multidistrict Litigation, *In re Mutual Fund Sales Antitrust Litigation*, Civil Action No. Misc. 103–73. See 374 F. Supp., at 97 n. 4. The District Court deferred determination of whether the actions could be maintained as class actions under Rule 23 and additionally postponed discovery and other activity pending disposition of the motion to dismiss in this case. 374 F. Supp., at 114.

[6] The NASD is registered under § 15A of the Securities Exchange

The United States charges that these agreements violate § 1 of the Sherman Act, 15 U. S. C. § 1,[10] and prays that they be enjoined under § 4 of that Act.

Count I charges a horizontal combination and conspiracy among the members of appellee NASD to pre-

Act of 1934, 15 U. S. C. § 78o–3, the so-called Maloney Act of 1938. The Maloney Act supplements the Securities and Exchange Commission's regulation of the over-the-counter markets by providing a system of cooperative self-regulation through voluntary associations of brokers and dealers. The Act provides that associations may register with the Commission pursuant to specified terms and conditions, and authorizes them to promulgate rules designed to prevent fraudulent and manipulative practices; to promote equitable principles of trade; to safeguard against unreasonable profits and charges; and generally to protect investors and the public interest. § 78o–3 (b) (8). The Act also authorizes the SEC to exercise a significant oversight function over the rules and activities of the registered associations. See, e. g., §§ 78o–3 (b), (e), (h), (j), and (k). The NASD is presently the only association registered under this Act.

[7] The mutual funds named as defendants in this action are Massachusetts Investors Growth Stock Fund, Inc., Fidelity Fund, Inc., and Wellington Fund, Inc.

[8] The defendant underwriters include the Crosby Corp., Vance, Sanders & Co., and the Wellington Management Co.

[9] Named as defendant broker-dealers are the following: Merrill Lynch, Pierce, Fenner & Smith, Inc., Bache & Co., Inc., Reynolds Securities Corp., E. I. duPont, Glore Forgan, Inc., E. F. Hutton, Inc., Walston & Co., Inc., Dean Witter & Co., Inc., Paine, Webber, Jackson & Curtis, Inc., and Hornblower & Weeks-Hemphill, Noyes, Inc.

[10] Section 1 of the Sherman Act provides in pertinent part:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. . . .

"Every person who shall make any contract or engage in any combination or conspiracy declared by sections 1 to 7 of this title to be illegal shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court."

vent the growth of a secondary dealer market in the purchase and sale of mutual-fund shares. See n. 42, *infra*. Counts II–VIII, by contrast, allege various vertical restrictions on secondary market activities. In Counts II, IV, and VI the United States charges that the principal underwriters and broker-dealers entered into agreements that compel the maintenance of the public offering price in brokerage transactions of specified mutual-fund shares, and that prohibit interdealer transactions by allowing each broker-dealer to sell and purchase shares only to or from investors.[11] Count VIII alleges that the broker-dealers entered into other, similar contracts and combinations with numerous principal underwriters. Counts III, V, and VII allege violations on the part of the principal underwriters and the funds themselves. In Counts III and VII the various defend-

---

[11] The violations alleged in Count II are typical of those charged in Counts IV and VI. In Count II, appellee Crosby, a principal underwriter of appellee Fidelity Fund, Inc., is charged with entering into contracts and combinations with appellee broker-dealers, the substantial terms of which are that

"(a) each broker/dealer must maintain the public offering price in any brokerage transaction in which it participates involving the purchase or sale of shares of the Fidelity Funds; and

"(b) each broker/dealer must sell shares of the Fidelity Funds only to investors or the fund and purchase such shares only from investors or the fund." App. 10–11.

Count VI, in addition to charging restrictive agreements similar to the above, alleged that appellee Wellington, a principal underwriter, agreed to act only as an agent of the appropriate mutual fund in all transactions with the broker-dealers. *Id.*, at 15.

The alleged effect of the restrictive agreement charged in ¶ (a) was to inhibit the growth and development of a brokerage market in mutual-fund shares. The alleged effect of the restriction identified in ¶ (b), by contrast, was to inhibit interdealer transactions and thus to restrict the growth and development of a secondary dealer market. App. 11.

ants are charged with entering into contracts requiring the restrictive underwriter-dealer agreements challenged in Counts II and VI. Count V charges that the agreement between one fund and its underwriter restricted the latter to serving as a principal for its own account in all transactions with the public, thereby prohibiting brokerage transactions in the fund's shares. App. 14.

After carefully examining the structure, purpose, and history of the Investment Company Act, 15 U. S. C. § 80a–1 *et seq.*, and the Maloney Act, 15 U. S. C. § 78*o*–3, the District Court held that this statutory scheme was " 'incompatible with the maintenance of (an) antitrust action,' " 374 F. Supp. 95, 109 (DC 1973), quoting *Silver* v. *New York Stock Exchange,* 373 U. S. 341, 358 (1963). The court concluded that §§ 22 (d) and (f) of the Investment Company Act, when read in conjunction with the Maloney Act, afford antitrust immunity for all of the practices here challenged. The court further held that apart from this explicit statutory immunity, the pervasive regulatory scheme established by these statutes confers an implied immunity from antitrust sanction in the "narrow area of distribution and sale of mutual fund shares." 374 F. Supp., at 114. The court accordingly dismissed the complaint, and the United States appealed to this Court.[12]

The position of the United States in this appeal can be summarized briefly. Noting that implied repeals of the antitrust laws are not favored, see, *e. g., United States* v. *Philadelphia National Bank,* 374 U. S. 321, 348 (1963), the United States urges that the antitrust immunity conferred by § 22 of the Investment Company

---

[12] The Court noted probable jurisdiction on October 15, 1974. 419 U. S. 822. Accordingly, the recent amendments to the Expediting Act, 88 Stat. 1709, 15 U. S. C. § 29 (1970 ed., Supp. IV), do not affect our jurisdiction.

Act should not extend beyond its precise terms, none of which, it maintains, requires or authorizes the practices here challenged. The United States maintains, moreover, that the District Court expanded the limits of the implied-immunity doctrine beyond those recognized by decisions of this Court. In response, appellees advance all of the positions relied on by the District Court. They are joined by the Securities and Exchange Commission (hereinafter SEC or Commission), which asserts as *amicus curiae* that the regulatory authority conferred upon it by § 22 (f) of the Investment Company Act displaces § 1 of the Sherman Act. The SEC contends, therefore, that the District Court properly dismissed Counts II–VIII but takes no position with respect to Count I.

## II

### A

The Investment Company Act of 1940 originated in congressional concern that the Securities Act of 1933, 48 Stat. 74, 15 U. S. C. § 77a *et seq.*, and the Securities Exchange Act of 1934, 48 Stat. 881, 15 U. S. C. § 78a *et seq.*, were inadequate to protect the purchasers of investment company securities. Thus, in § 30 of the Public Utility Holding Company Act, 49 Stat. 837, 15 U. S. C. § 79z–4, Congress directed the SEC to study the structures, practices, and problems of investment companies with a view toward proposing further legislation. Four years of intensive scrutiny of the industry culminated in the publication of the Investment Trust Study and the recommendation of legislation to rectify the problems and abuses it identified. After extensive congressional consideration, the Investment Company Act of 1940 was adopted.

The Act vests in the SEC broad regulatory authority

over the business practices of investment companies.[13] We are concerned on this appeal with § 22 of the Act, 15 U. S. C. § 80a–22, which controls the sales and distribution of mutual-fund shares. The questions presented require us to determine whether § 22 (d) obligates appellees to engage in the practices challenged in Counts II–VIII and thus necessarily confers antitrust immunity on them. If not, we must determine whether such practices are authorized by § 22 (f) and, if so, whether they are immune from antitrust sanction. Resolution of these issues will be facilitated by examining the nature of the problems and abuses to which § 22 is addressed, a matter to which we now turn.

## B

The most thorough description of the sales and distribution practices of mutual funds prior to passage of the

---

[13] For example, the Act requires companies to register with the SEC, 15 U. S. C. § 80a–8. See also § 80a–7. Companies also must register all securities they issue, see Securities Act of 1933, 15 U. S. C. § 77f; Investment Company Act, 15 U. S. C. § 80a–24 (a), and must submit for SEC inspection copies of the sales literature they send to prospective investors. § 80a–24 (b). The Investment Company Act requires the submission and periodic updating of detailed financial reports and documentation and the semiannual transmission of reports containing similar information to the shareholders. § 80a–29. It also imposes controls and restrictions on the internal management of investment companies: establishing minimum capital requirements, § 80a–14; limiting permissible methods for selecting directors, § 80a–16; and establishing certain qualifications for persons seeking to affiliate with the companies, § 80a–9. Finally, the Act imposes a number of controls on the internal practices of investment companies. For example, it requires a majority shareholder vote for certain fundamental business decisions, § 80a–13, and limits certain dividend distributions, § 80a–19. See generally The Mutual Fund Industry: A Legal Survey, 44 Notre Dame Law. 732 (1969).

Investment Company Act may be found in Part III of the Investment Trust Study.[14] That Study, as Congress has recognized, see 15 U. S. C. § 80a–1, forms the initial basis for any evaluation of the Act.

Prior to 1940 the basic framework for the primary distribution of mutual-fund shares was similar to that existing today. The fund normally retained a principal underwriter to serve as a wholesaler of its shares. The principal underwriter in turn contracted with a number of broker-dealers to sell the fund's shares to the investing public.[15] The price of the shares was based on the fund's net asset value at the approximate time of sale, and a sales commission or load was added to that price.

Although prior to 1940 the primary distribution system for mutual-fund shares was similar to the present one, a number of conditions then existed that largely disappeared following passage of the Act. The most prominently discussed characteristic was the "two-price system," which encouraged an active secondary market under conditions that tolerated disruptive and discriminatory trading practices. The two-price

---

[14] H. R. Doc. No. 279, 76th Cong., 1st Sess. (1940) (hereinafter Investment Trust Study pt. III). Part I of the Investment Trust Study is printed as H. R. Doc. No. 707, 75th Cong., 3d Sess. (1938). Part II of the Study is printed as H. R. Doc. No. 70, 76th Cong., 1st Sess. (1939) (hereinafter Investment Trust Study pt. II). For additional discussion of the operations of open-end management investment companies, see 1974 Staff Report; SEC Report of the Staff on the Potential Economic Impact of a Repeal of Section 22 (d) of the Investment Company Act of 1940 (Nov. 1972); H. R. Rep. No. 2337, 89th Cong., 2d Sess. (1966); SEC Report of the Special Study of Securities Markets, c. XI—Open-End Investment Companies (Mutual Funds), H. R. Doc. No. 95, pt. 4, 88th Cong., 1st Sess. (1963) (hereinafter 1963 Special Study).

[15] The broker-dealers operating within the primary distribution system are denominated "contract dealers" in the Study and will be so identified in this opinion.

system reflected the relationship between the commonly used method of computing the daily net asset value of mutual-fund shares and the manner in which the price for the following day was established. The net asset value of mutual funds, which depends on the market quotations of the stocks in their investment portfolios, fluctuates constantly. Most funds computed their net asset values daily on the basis of the fund's portfolio value at the close of exchange trading, and that figure established the sales price that would go into effect at a specified hour on the following day. During this interim period two prices were known: the present day's trading price based on the portfolio value established the previous day; and the following day's price, which was based on the net asset value computed at the close of exchange trading on the present day. One aware of both prices could engage in "riskless trading" during this interim period. See Investment Trust Study pt. III, pp. 851–852.

The two-price system did not benefit the investing public generally. Some of the mutual funds did not explain the system thoroughly, and unsophisticated investors probably were unaware of its existence. See *id.*, at 867. Even investors who knew of the two-price system and understood its operation were rarely in a position to exploit it fully. It was possible, however, for a knowledgeable investor to purchase shares in a rising market at the current price with the advance information that the next day's price would be higher. He thus could be guaranteed an immediate appreciation in the market value of his investment,[16] although this ad-

---

[16] The Study indicates that mutual funds increasingly began to disclose more information about the existence and operation of the two-price system. See Investment Trust Study pt. III, pp. 867–868. And in some instances the funds encouraged broker-dealers to explain to potential incoming investors the immediate appreciation in investment value that could be obtained from the pricing system in

vantage was obtained at the expense of the existing share-holders, whose equity interests were diluted by a corresponding amount.[17] The load fee that was charged in the sale of mutual funds to the investing public made it difficult for these investors to realize the "paper gain" obtained in such trading. Because the daily fluctuation in net asset value rarely exceeded the load, public investors generally were unable to realize immediate profits from the two-price system by engaging in rapid in-and-out trading. But insiders, who often were able to purchase shares without paying the load, did not operate under this constraint. Thus insiders could, and sometimes did, purchase shares for immediate redemption at the appreciated value. See n. 24, *infra,* and sources cited therein.

The two-price system often afforded other advantages to underwriters and broker-dealers. In a falling market they could enhance profits by waiting to fill orders with shares purchased from the fund at the next day's anticipated lower price. In a similar fashion, in a rising market they could take a "long position" in mutual-fund shares by establishing an inventory in order to satisfy anticipated purchases with securities previously obtained at a lower price. Investment Trust Study pt. III, pp. 854–855. In each case the investment company would

---

the hope of encouraging the purchase of shares. *Id.,* at 854. See Hearings on S. 3580 before a Subcommittee of the Senate Committee on Banking and Currency, 76th Cong., 3d Sess., pt. 1, p. 138 (1940) (hereinafter 1940 Senate Hearings).

[17] The existing shareholders' equity interests were diluted because the incoming investors bought into the fund at less than the actual value of the shares at the time of purchase. Moreover, SEC testimony indicated that this dilution could be substantial. In one instance the Commission calculated that the two-price system resulted in a loss to existing shareholders of one trust of some $133,000 in a single day *Id.,* at 139–140.

receive the lower of the two prevailing prices for its shares, *id.*, at 854, and the equity interests of shareholders would suffer a corresponding dilution.

As a result, an active secondary market in mutual-fund shares existed. *Id.*, at 865–867. Principal underwriters and contract broker-dealers often maintained inventory positions established by purchasing shares through the primary distribution system and by buying from other dealers and retiring shareholders.[18] Additionally, a "bootleg market" sprang up, consisting of broker-dealers having no contractual relationship with the fund or its principal underwriter. These bootleg dealers purchased shares at a discount from contract dealers or bought them from retiring shareholders at a price slightly higher than the redemption price. Bootleg dealers would then offer the shares at a price slightly lower than that required in the primary distribution system, thus "initiating a small scale price war between retailers and tend[ing] generally to disrupt the established offering price." *Id.*, at 865.

Section 22 of the Investment Company Act of 1940 was enacted with these abuses in mind. Sections 22 (a) and (c) were designed to "eliminat[e] or reduc[e] so far as reasonably practicable any dilution of the value of other outstanding securities . . . or any other result of [the] purchase, redemption or sale [of mutual fund securities] which is unfair to holders of such other outstanding securities," 15 U. S. C. § 80a–22 (a). They au-

---

[18] Contract dealers trading from an inventory position often could obtain an additional profit from the sales load. When the dealer acted as an agent for the fund and traded from the primary distribution system, the dealer and the underwriter divided the load charge in accordance with the sales agreement. But the dealer could retain the full load when he filled the purchase order from an inventory position in shares purchased from retiring shareholders or other dealers. Investment Trust Study pt. III, pp. 858–859.

thorize the NASD and the SEC to regulate certain pricing and trading practices in order to effectuate that goal.[19] Section 22 (b) authorizes registered securities associations and the SEC to prescribe the maximum sales commissions or loads that can be charged in connection with a primary distribution; and § 22 (e) protects the right of redemption by restricting mutual funds' power to suspend redemption or postpone the date of payment.

The issues presented in this litigation revolve around subsections (d) and (f) of § 22. Bearing in mind the history and purposes of the Investment Company Act, we now consider the effect of these subsections on the

---

[19] Sections 22 (a) and (c) reflect the same basic relationship between the SEC and the NASD that is established by the Maloney Act. See n. 6, *supra.* Section 22 (a) authorizes registered securities associations, in this case the NASD, to prescribe rules for the regulation of these matters. 15 U. S. C. § 80a–22 (a). The industry thus is afforded the initial opportunity to police its own practices. If, however, industry self-regulation proves insufficient, § 22 (c) authorizes the Commission to make rules and regulations "covering the same subject matter, and for the accomplishment of the same ends as are prescribed in subsection (a)," and proclaims that the SEC rules and regulations supersede any inconsistent rules of the registered securities association. 15 U. S. C. § 80a–22 (c).

Shortly after enactment of the Investment Company Act the NASD proposed, and the SEC approved, a rule establishing twice-daily pricing. See *National Association of Securities Dealers, Inc.,* 9 S. E. C. 38 (1941). Twice-daily pricing reduced the time period in which persons could engage in riskless trading and correspondingly decreased the potential for dilution. The Commission subsequently provided full protection against the dilutive effects of riskless trading. In late 1968 it exercised its authority under § 22 (c) to adopt Rule 22c–1, which requires all funds to establish "forward pricing." Forward pricing eliminates the potential for riskless trading altogether. See *Adoption of Rule 22c–1,* Investment Company Act Rel. No. 5519 (1968), [1967–1969 Transfer Binder] CCH Fed. Sec. L. Rep. ¶ 77,616; 17 CFR § 270.22c–1 (1974).

question of potential antitrust liability for the practices here challenged.

## III

Section 22 (d) prohibits mutual funds from selling shares at other than the current public offering price to any person except either to or through a principal underwriter for distribution. It further commands that "no dealer shall sell [mutual-fund shares] to any person except a dealer, a principal underwriter, or the issuer, except at a current public offering price described in the prospectus." 15 U. S. C. § 80a–22 (d).[20] By its terms, § 22 (d) excepts interdealer sales from its price maintenance requirement. Accordingly, this section cannot be relied upon by appellees as justification for the restrictions imposed upon interdealer transactions. At issue, rather, is the narrower question whether the § 22 (d) price maintenance mandate for sales by "dealers" applies to transactions in which a broker-dealer acts as a statutory "broker" rather than a statutory "dealer." The District Court concluded that it does, and thus that § 22 (d) governs transactions in which the broker-dealer acts as an agent for an investor as well as those in which he acts as a principal selling shares for his own account.

## A

The District Court's decision reflects an expansive

---

[20] This section provides in pertinent part:

"No registered investment company shall sell any redeemable security issued by it to any person except either to or through a principal underwriter for distribution or at a current public offering price described in the prospectus, and, if such class of security is being currently offered to the public by or through an underwriter, no principal underwriter of such security and no dealer shall sell any such security to any person except a dealer, a principal underwriter, or the issuer, except at a current public offering price described in the prospectus."

view of § 22 (d). The Investment Company Act specifically defines "broker" and "dealer"[21] and uses the terms distinctively throughout.[22] Appellees maintain, however, that the definition of "dealer" is sufficiently broad to require price maintenance in brokerage transactions. In support of this position appellees assert that the critical elements of the dealer definition are that the term relates to a "person" rather than to a transaction and that the person must engage "regularly" in the sale and purchase of securities to qualify as a dealer. It is argued, therefore, that any person who purchases and sells securities with sufficient regularity to qualify as a statutory dealer is thereafter bound by all dealer restrictions, regardless of the nature of the particular

---

[21] The Investment Company Act defines a "dealer" to be:

"[A]ny person regularly engaged in the business of buying and selling securities for his own account, through a broker or otherwise, but does not include a bank, insurance company, or investment company, or any person insofar as he is engaged in investing, reinvesting, or trading in securities, or in owning or holding securities, for his own account, either individually or in some fiduciary capacity, but not as a part of a regular business." 15 U. S. C. § 80a–2 (a) (11). A "broker," by contrast, is defined to be:

"[A]ny person engaged in the business of effecting transactions in securities for the account of others, but does not include a bank or any person solely by reason of the fact that such person is an underwriter for one or more investment companies." § 80a–2 (a) (6).

[22] Congress employed the term "broker" without reference to "dealer" in various sections of the Act. See §§ 80a–3 (c) (2), 80a–10 (b) (1), 80a–17 (e) (1) and (2). In other instances, the Act refers to "dealer" without reference to "broker," see §§ 80a–2 (a) (40), 80a–22 (c) and (d). And in some cases, including the very definition of the term "dealer" itself, see n. 21, *supra,* the Act refers to both "broker" and "dealer" in the same provision, see §§ 80a–1 (b) (2), 80a–9 (a) (1) and (2), and 80a–30 (a). Finally, the Act in some cases refers to the more general term "broker-dealer," see §§ 80a–22 (b) (1) and (2).

transaction in question. We do not find this argument persuasive.

Appellees' reliance on the statutory reference to "person" in defining dealer adds little to the analysis, for the Act defines "broker," "investment banker," "issuer," "underwriter," and others to be "persons" as well. See 15 U. S. C. §§ 80a–2 (a)(6), (21), (22), and (40). In each instance, the critical distinction relates to their transactional capacity. Moreover, we think that appellees' reliance on the regularity requirement in the dealer definition places undue emphasis on that element at the expense of the remainder of the provision. On the face of the statute the most apparent distinction between a broker and a dealer is that the former effects transactions for the account of others and the latter buys and sells securities for his own account. We therefore cannot agree that the terms of the Act compel the conclusion that a broker-dealer acting in a brokerage capacity would be bound by the § 22 (d) dealer mandate. Indeed, the language of the Act suggests the opposite result.

Even if we assume, *arguendo*, that the statutory definition is ambiguous, we find nothing in the contemporaneous legislative history of the Investment Company Act to justify interpreting § 22 (d) to encompass brokered transactions. That history is sparse,[23] and

---

[23] The original Commission-sponsored bill considered in the initial hearings before a Subcommittee of the Senate Banking and Commerce Committee, S. 3580, 76th Cong., 3d Sess. (1940), contained no provision resembling this subsection. Section 22 (d) first emerged in a compromise proposal advanced after a period of intensive consultation between the SEC and industry representatives that followed initial Senate hearings, see 1940 Senate Hearings, pt. 4, pp. 1105–1107, and the Commission subsequently has indicated that this provision was suggested by the industry. See *Midamerica Mutual Fund, Inc.*, 41 S. E. C. 328, 331 (1963); H. R. Rep. No. 2337, 89th Cong., 2d Sess., 219 (1966). Revised legislation reflecting this compromise was

suggests only that § 22 (d) was considered necessary to curb abuses that had arisen in the sales of securities to insiders.[24]

The prohibition against insider trading would seem adequately served by the first clause of § 22 (d), which prevents mutual funds from selling shares at other than the public offering price to any person except a principal underwriter or dealer. See n. 20, *supra*.[25] The further

---

submitted, and further hearings were conducted in the Senate and the House. Both bills were reported favorably by their respective committees, S. Rep. No. 1775, 76th Cong., 3d Sess. (1940); H. R. Rep. No. 2639, 76th Cong., 3d Sess. (1940), and the House bill, with minor amendments not relevant to this appeal, was accepted by the Senate. 86 Cong. Rec. 10069–10071 (1940).

This history perhaps explains the dearth of discussion relating to § 22 (d). The majority of the Senate hearings were completed before this provision was advanced, and both the Senate and House hearings that followed provide relatively little illumination as to the intended purpose or scope of this subsection.

[24] Insider trading abuses were identified as a problem during the Senate hearings that preceded submission of the compromise bill containing § 22 (d), see 1940 Senate Hearings, pt. 2, pp. 526–527 and 660–661. At the close of the initial Senate hearings an industry representative suggested that the Act should contain a provision prohibiting sales at preferential terms to insiders and others. *Id.*, at 1057. The Commission and industry representatives thereafter met to seek a compromise on the various differences that had been identified in the Senate hearings, and the industry memorandum outlining the nature of the resultant agreement again indicated that a provision should be added to the Act to prohibit insider trading. See Framework of Proposed Investment Company Bill (Title I), Memorandum Embodying Suggestions Resulting from Conferences Between Securities and Exchange Commission and Representatives of Investment Companies (May 13, 1940), printed in Hearings on H. R. 10065 before a Subcommittee of the House Committee on Interstate and Foreign Commerce, 76th Cong., 3d Sess., 99 (1940).

[25] The insider-trading prohibition is complemented by § 22 (g), which precludes issuance of mutual-fund shares for services or property other than cash or securities. 15 U. S. C. § 80a–22 (g).

restriction on dealer sales bears little relation to insider trading, however, and logically would be thought to serve some other purpose. The obvious effect of the dealer prohibition is to shield the primary distribution system from the competitive impact of unrestricted dealer trading in the secondary markets, a concern that was reflected in the Study, see Investment Trust Study pt. III, p. 865. The SEC perceives this to be one of the purposes of this provision.[26]

But concluding that protection of the primary distribution system is a purpose of § 22 (d) does little to resolve the question whether Congress intended to require strict price maintenance in *all* broker-dealer transactions with the investing public. By its terms, § 22 (d) protects only against the possibly disruptive effects of secondary dealer sales which, as statutorily defined, constituted the most active secondary market existing prior to the Act's passage. Nothing in the contemporary history suggests that Congress was equally concerned with possible disruption from investor transactions in outstanding shares conducted through statutory brokers.

---

[26] See *Adoption of Rule N–22D–1,* Investment Company Act Rel. No. 2798, p. 1 (1958), [1957–1961 Transfer Binder] CCH Fed. Sec. L. Rep. ¶ 76,625, p. 80,393; *Investors Diversified Services, Inc.,* Investment Company Act Rel. No. 3015 (1960), [1957–1961 Transfer Binder] CCH Fed. Sec. L. Rep. ¶ 76,699, p. 80,620; *In re Sideris,* Securities Exchange Act Rel. No. 8816, p. 2 (1970); *Mutual Funds Advisory, Inc.,* Investment Company Act Rel. No. 6932, p. 4 (1972).

The SEC also has suggested that preventing discrimination among investors was one of the purposes of this provision. See, *e. g., In re Sideris, supra; Midamerica Mutual Fund, Inc.,* 41 S. E. C., at 331; *Adoption of Rule N–22D–1, supra.* But we do not think that brokerage transactions inevitably would foster the kind of investor discrimination sought to be remedied by this statute. All investors would be equally free to seek to engage in brokered transactions, and the possibility that the more sophisticated or fortuitous investor would profit from this market does not, by itself, bring this category of transactions within the purview of § 22 (d).

Nor do we think that the history attending subsequent congressional consideration of the Act provides adequate support for appellees' contention that § 22 (d) requires strict price maintenance in all broker-dealer transactions in mutual-fund shares. To be sure, portions of the testimony of SEC Chairman Cohen before the House Subcommittee on Commerce and Finance in 1967 suggested that the price maintenance requirement of § 22 (d) encompassed all broker-dealers, irrespective of how they obtained the traded shares,[27] and on other occasions the Chairman referred to sales by brokers when discussing mutual-fund transactions.[28] Appellees also can point to congressional characterizations of § 22 (d) that suggest that some members of Congress understood the reach of that provision to be as broad as the District Court thought.[29]

---

[27] Responding to inquiries concerning the relationship of § 22 (d) and the operation of state law, Chairman Cohen stated:

"The statute is unequivocal. No person, no matter where he gets it, from the issuer, from another dealer, or even from a private person, no broker-dealer may sell a share of a particular fund at a price less than that fixed by the issuer." Hearings on the Investment Company Act Amendments of 1967 before the Subcommittee on Commerce and Finance of the House Committee on Interstate and Foreign Commerce, 90th Cong., 1st Sess., pt. 2, p. 711 (1967).

[28] *Id.*, at pt. 1, p. 53.

[29] Senator Sparkman, Chairman of the Senate Banking and Currency Committee which reported the 1970 amendments to the full Senate, stated on the floor of the Senate that § 22 (d) "now makes it a Federal crime for *anyone* to sell mutual fund shares at a price lower than that fixed by the fund's distributor." 115 Cong. Rec. 838 (1969) (emphasis added). Senator Magnuson reflected perhaps a similar view, stating that, as a result of § 22 (d), "mutual fund sales charges are *totally* insulated from price competition." 114 Cong. Rec. 23057 (1968) (emphasis added).

The testimony of some witnesses suggests that they shared this expansive view. See, *e. g.*, Hearings on S. 1659 before the Senate

Appellees maintain that this history indicates that Congress always intended § 22 (d) to control broker as well as dealer transactions, and that it re-enacted the amended § 22 with that purpose in mind. The District Court accepted this position, and it is not without some support in this historical record.[30] But impressive evidence to the contrary is found in the position consistently maintained by the SEC. Responding to an inquiry in 1941, the SEC General Counsel stated that § 22 (d) did not bar brokerage transactions in mutual-fund shares:

> "In my opinion the term 'dealer,' as used in section 22 (d), refers to the capacity in which a broker-dealer is acting in a particular transaction. It follows, therefore, that if a broker-dealer in a particular transaction is acting solely in the capacity of agent for a selling investor, or for both a selling investor and a purchasing investor, the sale may be made at a price other than the current offering price described in the prospectus. . . .
>
> "On the other hand, if a broker-dealer is acting for his own account in a transaction and as principal

Committee on Banking and Currency, 90th Cong., 1st Sess., pt. 2, p. 741 (1967) (hereinafter 1967 Senate Hearings) (testimony of Mr. Funston, President of the New York Stock Exchange); *id.,* at pt. 1, pp. 348, 356 (testimony of Professor Samuelson); *id.,* at pt. 2, p. 1064 (testimony of Professor Wallich).

[30] We conclude, however, that the context of the post-enactment history of § 22 (d) limits the force of the statements relied upon by appellees. A broker-dealer can serve in either a broker's or a dealer's capacity, and the distinction between the two functions is rather technical and precise. The parties are in general agreement that no significant number of brokered transactions, as statutorily defined, existed prior or subsequent to passage of the Act. In view of the care with which the statute defines these functions and the absence of focus on these distinctions in the statements in the subsequent consideration of § 22 (d), we think that the broader characterizations of that section must be viewed with some skepticism.

sells a redeemable security to an investor, the public offering price must be maintained, even though the sale is made through another broker who acts as agent for the seller, the investor, or both.

"As section 22 (d) itself states, the offering price is not required to be maintained in the case of sales in which both the buyer and the seller are dealers acting as principals in the transaction." Investment Company Act, Rel. No. 78, Mar. 4, 1941, 11 Fed. Reg. 10992 (1941).

This substantially contemporaneous interpretation of the Act has consistently been maintained in subsequent SEC opinions, see *Oxford Co., Inc.,* 21 S. E. C. 681, 690 (1946); *Mutual Funds Advisory, Inc.,* Investment Company Act Rel. No. 6932, p. 3 (1972). The same position was asserted in a recent staff report, see 1974 Staff Report 105 n. 2, 107 n. 2, and 109, was relied on by the SEC in its subsequent decision to encourage limited price competition in brokered transactions,[31] and is advanced by it as

---

[31] Acting in accordance with the recommendations of the Staff Report, the SEC Chairman recently requested that the NASD amend its Rules of Fair Practice to prohibit agreements between underwriters and broker-dealers that preclude broker-dealers, acting as agents, "from matching orders to buy and sell fund shares in a secondary market at competitively determined prices and commission rates." Letter from Mr. Ray Garrett, Jr., Chairman of the SEC to Mr. Gordon S. Macklin, President of the NASD, Nov. 22, 1974, printed in Brief for Appellees Bache & Co. et al., Add. 18. The Chairman further revealed the SEC's intention to exercise its regulatory authority under § 22 (f) to neutralize any adverse effects this market might have on the fund's primary distribution system. *Id.,* at Add. 19. As the Staff Report indicates, the Commission's exercise of regulatory authority is premised on its view that § 22 (d) does not require strict price maintenance in brokered transactions. See 1974 Staff Report 104. If § 22 (d) did control these transactions as well as "dealer" sales, the Commission's ability

*amicus curiae* in this Court. This consistent and long-standing interpretation by the agency charged with administration of the Act, while not controlling, is entitled to considerable weight. See, *e. g., Saxbe* v. *Bustos,* 419 U. S. 65 (1974); *Investment Co. Institute* v. *Camp,* 401 U. S. 617, 626–627 (1971); *Udall* v. *Tallman,* 380 U. S. 1, 16 (1965).

## B

The substance of appellees' position is that the dealer prohibition of § 22 (d) should be interpreted in generic rather than statutory terms. The price maintenance requirement of that section accordingly would encompass all broker-dealer transactions with the investing public and would shelter them from antitrust sanction. But such an expansion of § 22 (d) beyond its terms would not only displace the antitrust laws by implication, it also would impinge seriously on the SEC's more flexible regulatory authority under § 22 (f).[32]

Implied antitrust immunity is not favored, and can be justified only by a convincing showing of clear repugnancy between the antitrust laws and the regulatory sys-

---

to encourage controlled competition in this market would be subject to question.

[32] The Department of Justice previously suggested a manner in which its interpretation of § 22 (d) could be reconciled with the Commission's exercise of regulatory authority over brokered transactions. Addressing the question of possible repeal of § 22 (d), the Justice Department suggested that rather than continue to wait for congressional repeal, the Commission should eliminate the adverse effects of price maintenance by freeing all transactions from the § 22 (d) mandate through the exercise of its § 6 (c) power of exemption, 15 U. S. C. § 80a–6 (c). 1974 Staff Report 70. This presumably would leave the SEC free to regulate transactions through the exercise of the powers conferred on it by other provisions of the Act. We need not consider the validity of the Justice Department's broad interpretation of the SEC's power of exemption, for even assuming it to be correct our analysis would not be affected.

tem. See, *e. g., United States* v. *Philadelphia National Bank,* 374 U. S., at 348; *United States* v. *Borden Co.,* 308 U. S. 188, 197–206 (1939). We think no such showing has been made. Moreover, in addition to satisfying our responsibility to reconcile the antitrust and regulatory statutes where feasible, *Silver* v. *New York Stock Exchange,* 373 U. S., at 356–357, we must interpret the Investment Company Act in a manner most conducive to the effectuation of its goals. We conclude that appellees' interpretation of § 22 (d) serves neither purpose, and cannot be justified by the language or history of that section.

We therefore hold that the price maintenance mandate of § 22 (d) cannot be stretched beyond its literal terms to encompass transactions by broker-dealers acting as statutory "brokers." Congress defined the limitations for the mandatory price maintenance requirement of the Investment Company Act. "We are not only bound by those limitations but we are bound to construe them strictly, since resale price maintenance is a privilege restrictive of a free economy." *United States* v. *McKesson & Robbins,* 351 U. S. 305, 316 (1956). Accordingly, we hold that the District Court erred in relying on § 22 (d) in determining that the activities here questioned are immune from antitrust liability.

## IV

Our determination that the restrictions on the secondary market are not immunized by § 22 (d) does not end the inquiry, for the District Court also found them sheltered from antitrust liability by § 22 (f). Appellees, joined by the SEC, defend this ruling and urge that it requires dismissal of the challenge to the vertical restrictions sought to be enjoined in Counts II–VIII.

Section 22 (f) authorizes mutual funds to impose

restrictions on the negotiability and transferability of their shares, provided they conform with the fund's registration statement and do not contravene any rules and regulations the Commission may prescribe in the interests of the holders of all of the outstanding securities.[33]   The Government does not contend that the vertical restrictions are not disclosed in the registration statements of the funds in question.   Nor does it assert that the agreements imposing such restrictions violate Commission rules and regulations.   Indeed, it could not do so, because to date the SEC has prescribed no such standards.   Instead the Government maintains that the contractual restrictions do not come within the meaning of the Act, asserting that § 22 (f) does not authorize the imposition of restraints on the distribution system rather than on the shares themselves.   The Government thus apparently urges that the only limitations contemplated by this section are those that appear on the face of the certificate itself.   The Government also urges that the SEC's unexercised power to prescribe rules and regulations is insufficient to create repugnancy between its regulatory authority and the antitrust laws.

Our examination of the language and history of § 22 (f) persuades us,. however, that the agreements challenged in Counts II–VIII are among the kinds of restrictions Congress contemplated when it enacted that section.   And this conclusion necessarily leads to a determination that they are immune from liability under the Sherman Act,

---

[33] Section 22 (f) of the Act, 15 U. S. C. § 80a–22 (f), provides:

"No registered open-end company shall restrict the transferability or negotiability of any security of which it is the issuer except in conformity with the statements with respect thereto contained in its registration statement nor in contravention of such rules and regulations as the Commission may prescribe in the interests of the holders of all of the outstanding securities of such investment company."

for we see no way to reconcile the Commission's power to authorize these restrictions with the competing mandate of the antitrust laws.

## A

Unlike § 22 (d), § 22 (f) originated in the Commission-sponsored bill considered in the Senate subcommittee hearings that preceded introduction of the compromise proposal later enacted into law. The Commission-sponsored provision authorized the SEC to promulgate rules, regulations, or orders prohibiting restrictions on the transferability or negotiability of mutual-fund shares, S. 3580, § 22 (d)(2), 76th Cong., 3d Sess. (1940).[34] Commission testimony indicates that it considered this authority necessary to allow regulatory control of industry measures designed to deal with the disruptive effects of "bootleg market" trading and with other detrimental trading practices identified in the Investment Trust Study.[35]

---

[34] Section 22 (d) of the original bill, S. 3580, 76th Cong., 3d Sess. (1940), provided, in pertinent part:

"The Commission is authorized, by rules and regulations or order in the public interest or for the protection of investors, to prohibit—

. . . . . .

"(2) restrictions upon the transferability or negotiability of any redeemable security of which any registered investment company is the issuer."

[35] Testifying before the Senate subcommittee, an SEC spokesman stated:

"Now coming to subparagraph (2) of (d), it just says that the Commission shall have the right to make rules and regulations with respect to any restrictions upon the transferability or negotiability of any redeemable security of which any registered investment company is the issuer.

"There are some companies that have a provision in their certificates to the effect that you cannot sell that certificate to anybody else, and the only way you can sell it is to sell it back to the com-

The Study indicates, moreover, that a number of funds had begun to deal with these problems prior to passage of the Act. And while their methods may have included the imposition of restrictive legends on the face of the certificate, see n. 35, *supra,* they were by no means confined to such narrow limits. A number of funds imposed controls on the activities of their principal underwriters, see Investment Trust Study pt. III, pp. 868–869; and in some instances the funds required the underwriters to impose similar restrictions on the dealers, see *id.,* at 869, or entered into these restrictive agreements with the dealers themselves, *id.,* at 870–871.

In view of the history of the Investment Company Act, we find no justification for limiting the range of possible transfer restrictions to those that appear on the face of the certificate. The bootleg market was primarily a problem of the distribution system, and bootleg dealers found a source of supply in the contract dealers as well as in retiring shareholders. See *id.,* at 865. Moreover, the Study indicates that part of the bootleg distribution system consisted of "trading firms" that served as wholesalers of mutual-fund securities in much the same fashion as the principal underwriters. These trading firms primarily purchased and sold shares to and from other dealers, Investment Trust Study pt. II, p. 327, frequently offering them at a price slightly lower than

---

pany. That is a technical problem. It presents a whole problem which they call the bootleg market. What happens is that dealers keep switching people from one company to another. In order to prevent these switches, some provisions require that you cannot make these switches but must sell the certificate back to the company. . . .

"If the committee wants the provision, we shall recommend what, on the basis of our experience up to the present time, it ought to be; but we think subjects like that ought to be a matter of rules and regulations." 1940 Senate Hearings, pt. 1, pp. 292–293.

the discounted rate charged to dealers in the primary distribution system. *Id.,* at 327–328. Thus trading firms not only helped supply the bootleg dealers whose sales undercut those of the contract dealers, they competed with the principal underwriters by offering a source for lower cost shares that inevitably discouraged participation in the primary distribution system. See *id.,* at 328 n. 85.

The bootleg market was a complex phenomenon whose principal origins lay in the distribution system itself. In view of this history, limitation of the industry's ability, subject of course to SEC regulation, to reach these problems at their source would constitute an inappropriate contraction of the remedial function of the statute.[36] Indeed, in view of the role of trading firms and interdealer transactions in the maintenance of the bootleg market, the narrow interpretation of § 22 (f) urged by the Government would seem to afford inadequate authority to deal with the problem.

Together, §§ 22 (d) and 22 (f) protect the primary distribution system for mutual-fund securities. Section 22 (d), by eliminating price competition in dealer sales, inhibits the most disruptive factor in the pre-1940's mutual market and thus assures the maintenance of a viable sales system. Section 22 (f) complements this protection by authorizing the funds and the SEC to deal more flexibly with other detrimental trading practices by

---

[36] Neither are we convinced of the necessity to limit negotiability or transferability restrictions to those appearing on the face of the certificate in order to assure their adequate disclosure to investors. Section 24 of the Act requires that mutual funds submit for SEC inspection copies of all sales literature that they send to prospective investors. 15 U. S. C. § 80a–24 (b). The Commission is therefore fully apprised as to the nature and sufficiency of the disclosure of these restrictions and can, if necessary, require supplementation of the information provided investors.

imposing SEC-approved restrictions on transferability and negotiability. The Government's limiting interpretation of § 22 (f) compromises this flexible mandate, and cannot be accepted.

We find support for our interpretation of § 22 (f) in the views expressed by the SEC shortly after the passage of the Act. Rule 26 (j)(2), proposed by the NASD to curb abuses identified in the Study and the congressional hearings, provided limitations on underwriter sales and redemptions to or from dealers who are not parties to sales agreements. In commenting on this proposed rule, the SEC characterized it as a "restriction on the transferability of securities," and specifically adverted to its power to regulate such restrictions under § 22 (f). *National Association of Securities Dealers, Inc.,* 9 S. E. C. 38, 44–45 and n. 10 (1941). As indicated above, see *supra,* at 719, and sources there cited, this contemporaneous interpretation by the responsible agency is entitled to considerable weight. We therefore conclude that the restrictions on transferability and negotiability contemplated by § 22 (f) include restrictions on the distribution system for mutual-fund shares as well as limitations on the face of the shares themselves. The narrower interpretation of this provision advanced by the Government would disserve the broad remedial function of the statute.[37]

---

[37] Neither do we agree with the Government's suggestion that § 22 (f) does not authorize restrictions in contracts between underwriters and dealers in which the fund is not a party. We note, preliminarily, that this position would not save Counts III, V, and VII from dismissal, since they relate to restrictions on underwriter conduct that are imposed by the fund. Even under the most technical reading of the statute these restrictions are "fund-imposed." Moreover, it further appears from the complaint that the agreement challenged in Count II is required by the fund-underwriter agreement challenged in Count III and thus also is "fund-imposed"

The Government's additional contention that the SEC's exercise of regulatory authority has been insufficient to give rise to an implied immunity for agreements conforming with § 22 (f) misconceives the intended operation of the statute. By its terms, § 22 (f) authorizes properly disclosed restrictions unless they are inconsistent with SEC rules or regulations. The provision thus authorizes funds to impose transferability or negotiability restrictions, subject to Commission disapproval. In view of the evolution of this provision, there can be no doubt that this is precisely what Congress intended.

Section 22 (f) as originally introduced would have authorized the SEC to promulgate rules, regulations, or orders prohibiting restrictions on the redeemability or transferability of mutual-fund shares. Congressional consideration of that provision raised some question whether existing restrictions on transferability and negotiability would remain valid unless specifically disapproved by the SEC.[38] The compromise provision, which

---

in any but the most literal sense. More importantly, however, we think that the Government's position fails to recognize the relationship between the various participants in the distribution chain. As the history of the Investment Company Act recognizes, the relationship between the fund and its principal underwriter traditionally has been a close one. Sections 15 (b) and (c) reflect this fact, requiring, in effect, that funds establish written contracts with the underwriter that must be approved by a majority of the fund's disinterested directors and cannot remain in force for more than two years. 15 U. S. C. §§ 80a–15 (b) and (c). And NASD Rule 26 (c), in effect since 1941, requires that principal underwriters enter into agreements with the dealers who distribute the fund's securities. See *National Association of Securities Dealers, Inc.*, 9 S. E. C., at 44, 48. In view of these requirements, and the broad remedial purpose of § 22 (f), we think that the underwriter-dealer agreements challenged in this complaint also must be regarded as fund-imposed within the contemplation of the statute.

[38] See 1940 Senate Hearings, pt. 1, p. 293.

subsequently was enacted into law, eliminated this uncertainty, however, and manifested a more positive attitude toward self-regulation.

Thus § 22 (f) specifically recognizes that mutual funds can impose such restrictions on the distribution system provided they are disclosed in the registration statement and conform to any rules and regulations that the SEC might adopt. In addition, § 22 (f) alters the focus of Commission scrutiny. Whereas the original provision allowed the SEC to make rules that serve "the public interest or . . . the protection of investors," S. 3580, § 22 (d)(2), *supra,* § 22 (f) as enacted limits the Commission's rulemaking authority to the protection of the "interests of the holders of all of the outstanding securities of such investment company." 15 U. S. C. § 80a–22 (f). Viewed in this historical context, the statute reflects a clear congressional determination that, subject to Commission oversight, mutual funds should be allowed to retain the initiative in dealing with the potentially adverse effects of disruptive trading practices.

The Commission repeatedly has recognized the role of private agreements in the control of trading practices in the mutual-fund industry. For example, in *First Multifund of America, Inc.,* Investment Company Act Rel. No. 6700 (1971), [1970–1971 Transfer Binder] CCH Fed. Sec. L. Rep. ¶ 78,209, p. 80,602, it looked to restrictive agreements similar to those challenged in this litigation to ascertain an investment advisor's capacity in a particular transaction. At no point did it intimate that those agreements were not legitimate.[39] Likewise,

---

[39] Commissioner Loomis, dissenting from an SEC determination that an applicant lacked standing to seek an exemption from §§ 17 (a)(1) and 22 (d) of the Act, stated:

"I would conclude that applicant is a dealer in its relationship with the fund underwriter because to do otherwise would require us to

Commission reports repeatedly have acknowledged the significant role that private agreements have played in restricting the growth of a secondary market in mutual-fund shares.[40]   Until recently the Commission has allowed the industry to control the secondary market through contractual restrictions duly filed and publicly disclosed. Even the SEC's recently expressed intention to introduce an element of competition in brokered transactions reflects measured caution as to the possibly adverse impact of a totally unregulated and restrained brokerage market on the primary distribution system.   See n. 31, *supra*. The Commission's acceptance of fund-initiated restrictions for more than three decades hardly represents abdication of its regulatory responsibilities.   Rather, we think it manifests an informed administrative judgment that the contractual restrictions employed by the funds to protect their shareholders were appropriate means for combating the problems of the industry.   The SEC's election not to initiate restrictive rules or regulations is precisely the kind of administrative oversight of private practices that Congress contemplated when it enacted § 22 (f).

We conclude, therefore, that the vertical restrictions sought to be enjoined in Counts II–VIII are among the kinds of agreements authorized by § 22 (f) of the Investment Company Act.

---

ignore or nullify the perfectly lawful requirement in the dealer agreements that applicant act as a dealer. . . . I do not know of anything unlawful about the generally accepted form of dealer agreement used in the investment company industry." *Mutual Funds Advisory, Inc.*, Investment Company Act Rel. No. 6932, p. 7 (1972) (dissenting opinion).

While the majority disagreed with Commissioner Loomis' assessment of the facts of the case, it did not question his approval of the mentioned dealer agreement.

[40] See 1963 Special Study 98; 1974 Staff Report 104–106.

## B

The agreements questioned by the United States restrict the terms under which the appellee underwriters and broker-dealers may trade in shares of mutual funds. Such restrictions, effecting resale price maintenance and concerted refusals to deal, normally would constitute *per se* violations of § 1 of the Sherman Act. See, *e. g., Klor's, Inc.* v. *Broadway-Hale Stores, Inc.*, 359 U. S. 207, 211–213 (1959); *Fashion Originators' Guild of America, Inc.* v. *FTC*, 312 U. S. 457, 465–468 (1941). Here, however, Congress has made a judgment that these restrictions on competition might be necessitated by the unique problems of the mutual-fund industry, and has vested in the SEC final authority to determine whether and to what extent they should be tolerated "in the interests of the holders of all the outstanding securities" of mutual funds. 15 U. S. C. § 80a–22 (f).

The SEC, the federal agency responsible for regulating the conduct of the mutual-fund industry, urges that its authority will be compromised seriously if these agreements are deemed actionable under the Sherman Act.[41] We agree. There can be no reconciliation of its authority under § 22 (f) to permit these and similar restrictive agreements with the Sherman Act's declaration that they are illegal *per se*. In this instance the antitrust laws must give way if the regulatory scheme established

---

[41] The SEC maintains:

"It would nullify the effect of this grant of regulatory authority to the Commission [under § 22 (f)] for this Court to hold that a district court may apply antitrust principles to conduct like that alleged in Counts II through VIII, when the expert body designated and empowered by Congress to regulate and supervise that conduct has not heretofore deemed it appropriate to prohibit the conduct." Brief for SEC as *Amicus Curiae* 54.

by the Investment Company Act is to work. *Silver* v. *New York Stock Exchange*, 373 U. S. 341 (1963). We conclude, therefore, that such agreements are not actionable under the Sherman Act, and that the District Court properly dismissed Counts II–VIII.

## V

It remains to be determined whether the District Court properly dismissed Count I of the Government's complaint, which charged activities allegedly constituting a horizontal conspiracy between the NASD and its members to "prevent the growth of a secondary dealer market and a brokerage market in the purchase and sale of mutual fund shares." App. 9.

The precise nature of the allegations of the complaint are obscured by subsequent concessions made by the Government to the District Court and reiterated here. It is clear, however, that Count I alleges activities that are neither required by § 22 (d) nor authorized under § 22 (f). And since they cannot find antitrust shelter in these provisions of the Investment Company Act, the question presented is whether the SEC's exercise of regulatory authority under this statute and the Maloney Act is sufficiently pervasive to confer an implied immunity. We hold that it is, and accordingly affirm the District Court's dismissal of this portion of the complaint.

Count I originally appeared to be a general attack on the NASD's role in encouraging the restrictions on secondary market activities challenged in the remainder of the Government's complaint. The acts charged in Count I focused in large part on NASD rules, and on information distributed by that association to its members.[42]

---

[42] The complaint averred that, in effectuating the conspiracy to restrain the growth of a secondary market in mutual-fund shares,

Subsequently the Government advised the District Court that its complaint was not to be read as a direct attack on NASD rules, however, and it repeated that position before this Court.[43] The Government now contends that

the NASD, its members, and more particularly the other named defendants,

"(a) established and maintained rules which inhibited the development of a secondary dealer market and a brokerage market in mutual fund shares;

"(b) established and maintained rules which induced broker/dealers to enter into sales agreements with principal underwriters, with knowledge that sales agreements contained restrictive provisions which inhibited the development of a secondary dealer market and brokerage market in mutual fund shares;

"(c) induced member principal underwriters to include restrictive provisions in their sales agreements;

"(d) discouraged persons who made inquiry about the legality of a brokerage market from participating in a brokerage market and distributed misleading information to its members concerning the legality of a brokerage market in mutual fund shares; and

"(e) suppressed market quotations for the secondary dealer market." App. 9.

[43] The Government first indicated abandonment of its attack on the NASD rules during oral argument of appellees' motion to dismiss. See App. 328–332. Notwithstanding clauses (a) and (b) of ¶ 17 of the complaint, see n. 42, *supra,* the Government's counsel stated that it did not intend to challenge any NASD rule, App. 330. Counsel ambiguously suggested, however, that the members' compliance with those rules had aided and abetted the alleged conspiracy, *id.,* at 332, and stated that informal and secret activities of the Association likewise had tended to inhibit growth of the secondary market, *id.,* at 330. Thereafter, in response to the District Court's invitation to join in the litigation as *amicus curiae,* the SEC expressed its concern that the action might involve an attack on NASD rules, a matter "over which the Commission is granted exclusive original jurisdiction by Section 15A of the Securities Exchange Act of 1934, 15 U. S. C. § 78*o*–3, *et seq.* (the Maloney Act)." Letter from Mr. Lawrence E. Nerheim, General Counsel of the SEC, to the District Court, App. 323. The Government thereafter informed the court that the issues it sought to raise did not represent "an attack

its complaint should be interpreted as a challenge to various unofficial NASD interpretations and to appellees' extension of the rules in a manner that inhibits a secondary market.

In view of the scope of the SEC's regulatory authority over the activities of the NASD, the Government's decision to withdraw from direct attack on the association's rules was prudent. The SEC's supervisory authority over the NASD is extensive. Not only does the Maloney Act require the SEC to determine whether an association satisfies the strict statutory requirements of that Act and thus qualifies to engage in supervised regulation of the trading activities of its membership, 15 U. S. C. § 78*o*-3 (b), it requires registered associations thereafter to submit for Commission approval any proposed rule changes, § 78*o*-3 (j). The Maloney Act additionally authorizes the SEC to request changes in or supplementation of association rules, a power that recently has been exercised with respect to some of the precise conduct questioned in this litigation, see n. 31, *supra*. If such a request is not complied with, the SEC may order such changes itself. § 78*o*-3 (k)(2).

The SEC, in its exercise of authority over association rules and practices, is charged with protection of the public interest as well as the interests of shareholders, see, *e. g.*, §§ 78*o*-3 (a)(1), (b)(3), and (c), and it repeatedly has indicated that it weighs competitive concerns in the exercise of its continued supervisory responsibility. See, *e. g.*, *National Association of Securities Dealers, Inc.*, 19 S. E. C. 424, 436–437, 486–487

---

upon NASD Rules as such" but rather "aimed at an over-all course of conduct engaged in by the NASD and its members going beyond the NASD's rule-making authority." Letter from Mr. Bruce B. Wilson, Acting Assistant Attorney General for the Antitrust Division, to the District Court, App. 327. It maintains the same position in this Court. See Brief for United States 51 n. 47.

(1945); *National Association of Securities Dealers, Inc.,* 9 S. E. C., at 43–46; see also 1974 Staff Report 105, 109. As the Court previously has recognized, *United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150, 227 n. 60 (1940), the investiture of such pervasive supervisory authority in the SEC suggests that Congress intended to lift the ban of the Sherman Act from association activities approved by the SEC.

We further conclude that the Government's attack on NASD interpretations of those rules cannot be maintained under the Sherman Act, for we see no meaningful distinction between the Association's rules and the manner in which it construes and implements them. Each is equally a subject of SEC oversight.

Finally, we hold that the Government's additional challenges to the alleged activities of the membership of the NASD designed to encourage the kinds of restraints averred in Counts II–VIII likewise are precluded by the regulatory authority vested in the SEC by the Maloney and Investment Company Acts. It should be noted that the Government does not contend that appellees' activities have had the purpose or effect of restraining competition among the various funds.[44] Instead, the Government urges in Count I that appellees' alleged conspiracy was designed to encourage the suppression of intrafund secondary market activities, precisely the restriction that the SEC consistently has approved pursuant to § 22 (f) for nearly 35 years. This close relationship is fatal to the Government's complaint, as the Commission's regulatory approval of the restrictive agree-

---

[44] Indeed, it appears that vigorous interbrand competition exists in the mutual-fund industry—between the load .funds themselves, between load and no-load funds, between open- and closed-end companies, and between all of these investment forms and other investments. See 1974 Staff Report 20 *et seq.*

ments challenged in Counts II–VIII cannot be reconciled with the Government's attack on the ancillary activities averred in Count I. And this conclusion applies with equal force now that the SEC has determined to introduce a controlled measure of competition into the secondary market.

There can be little question that the broad regulatory authority conferred upon the SEC by the Maloney and Investment Company Acts enables it to monitor the activities questioned in Count I, and the history of Commission regulations suggests no laxity in the exercise of this authority.[45] To the extent that any of appellees' ancillary activities frustrate the SEC's regulatory objectives it has ample authority to eliminate them.[46]

Here implied repeal of the antitrust laws is "necessary to make the [regulatory scheme] work." *Silver* v. *New York Stock Exchange*, 373 U. S., at 357. In generally similar situations, we have implied immunity in particular and discrete instances to assure that the federal agency entrusted with regulation in the public interest could carry out that responsibility free from the disruption of conflicting judgments that might be voiced by courts exercising jurisdiction under the antitrust laws. See

---

[45] As SEC Chairman Garrett observed in his letter submitting the 1974 Staff Report for congressional consideration: "No issuer of securities is subject to more detailed regulation than a mutual fund." Letter from Ray Garrett, Jr., SEC Chairman, to the Honorable John Sparkman, Chairman of the Committee on Banking, Housing, and Urban Affairs, United States Senate (Nov. 4, 1974), contained in 1974 Staff Report, at v.

[46] The Commission can, for example, require amendment of the NASD rules regulating the conduct of its membership, see 15 U. S. C. § 78o–3 (k) (2), or exercise the more general rulemaking power conferred by § 38 (a) of the Investment Company Act, 15 U. S. C. § 80a–37 (a), to contain any of the challenged activities that might in any way frustrate its regulation of the restrictions it authorizes under § 22 (f).

*Hughes Tool Co.* v. *Trans World Airlines,* 409 U. S. 363 (1973); *Pan American World Airways, Inc.* v. *United States,* 371 U. S. 296 (1963). In this instance, maintenance of an antitrust action for activities so directly related to the SEC's responsibilities poses a substantial danger that appellees would be subjected to duplicative and inconsistent standards. This is hardly a result that Congress would have mandated. We therefore hold that with respect to the activities challenged in Count I of the complaint, the Sherman Act has been displaced by the pervasive regulatory scheme established by the Maloney and Investment Company Acts.

*Affirmed.*

MR. JUSTICE WHITE, with whom MR. JUSTICE DOUGLAS, MR. JUSTICE BRENNAN, and MR. JUSTICE MARSHALL join, dissenting.

The majority repeats the principle so often applied by this Court that "[i]mplied antitrust immunity is not favored, and can be justified only by a convincing showing of clear repugnancy between the antitrust laws and the regulatory system." *Ante,* at 719–720. That fundamental rule, though invoked again and again in our decisions, retained its vitality because in the many instances of its evocation it was given life and meaning by a close analysis of the legislation and facts involved in the particular case, an analysis inspired by the "felt indispensable role of antitrust policy in the maintenance of a free economy . . . ." *United States* v. *Philadelphia National Bank,* 374 U. S. 321, 348 (1963). Absent that inspiration the principle becomes an archaism at best, and no longer reflects the tense interplay of differing and at times conflicting public policies.

Although I do not disagree with much of the Court's opinion in its construction of §§ 22 (d) and (f) of the

Investment Company Act, 54 Stat. 824, as amended, 15 U. S. C. §§ 80a–22 (d) and (f), its ultimate holding, which in contrast to the earlier portions of its opinion is devoid of detailed discussion of the applicable law, I find unacceptable. Under that holding, in light of the context of this case, implied antitrust immunity becomes the rule where a regulatory agency has authority to approve business conduct whether or not the agency is directed to consider antitrust factors in making its regulatory decisions and whether or not there is other evidence that Congress intended to displace judicial with administrative antitrust enforcement.

## I

If Congress itself expressly permits or directs particular private conduct that would otherwise violate the antitrust laws, it can be safely assumed that Congress has made the necessary policy choices and preferred to permit rather than to prevent the acts in question. There is no dispute in this case, for example, that compliance with § 22 (d)'s requirement that open-end funds and dealers sell at the public offering price is not subject to attack under the antitrust laws.

It also happens that in subjecting areas of commercial activity to regulation, Congress frequently authorizes a regulatory agency to approve certain kinds of transactions if they conform to the appropriate regulatory standard such as the "public interest" or the "public convenience and necessity" and correspondingly provides that, when approved, those transactions will be immune from attack under the antitrust laws. Section 414 of the Federal Aviation Act of 1958, 72 Stat. 770, 49 U. S. C. § 1384, for example, provides that any person affected by an order issued under §§ 408, 409, or 412 of that Act, 49 U. S. C. §§ 1378, 1379, 1382, is "relieved from the

operations of the 'antitrust laws,' " including the Sherman Act, "insofar as may be necessary to enable such person to do anything authorized, approved, or required by such order." *Hughes Tool Co.* v. *Trans World Airlines,* 409 U. S. 363 (1973), thus involved acts and transactions expressly immunized from antitrust scrutiny. Section 5 (11) of the Interstate Commerce Act, 24 Stat. 380, as amended, 49 U. S. C. § 5 (11), similarly provides that carriers and their employees participating in a transaction approved or authorized under § 5 "shall be and they are relieved from the operation of the antitrust laws . . . ." Also, the Clayton Act itself provides that § 7's prohibitions will not apply to transactions duly consummated pursuant to authority given by certain named agencies under any statutory provisions vesting power in those agencies. 38 Stat. 731, as amended, 15 U. S. C. § 18.

The courts have, of course, recognized express exemptions such as these; but the invariable rule has been "that exemptions from antitrust laws are strictly construed," *FMC* v. *Seatrain Lines, Inc.,* 411 U. S. 726, 733 (1973), and that exemption will not be implied beyond that given by the letter of the law. In *Seatrain* the Maritime Commission was authorized by statute to approve and immunize from antitrust challenge seven categories of agreements between shipping companies, including agreements "controlling, regulating, preventing, or destroying competition." The Court, construing narrowly the category arguably embracing the merger agreement under consideration, held that merger agreements between shipping companies were not subject to approval by the Commission and consequently were not entitled to exemption under the antitrust laws.

Absent express immunization or its equivalent, private business arrangements are not exempt from the antitrust

laws merely because Congress has empowered an agency to authorize the very conduct which is later challenged in court under the antitrust laws. Where the regulatory standard is the "public interest," or something similar, there is no reason whatsoever to conclude that Congress intended the strong policy of the antitrust laws to be displaced or to be ignored in determining the public interest and in approving or disapproving the questioned conduct. This has been the consistent position of this Court. In *United States* v. *Radio Corp. of America,* 358 U. S. 334 (1959), the approval of the Federal Communications Commission of an exchange of television stations was sought as required by statute, The Commission approved the exchange, finding, in accordance with the statutory standard, that the public interest, convenience, and necessity would be served. The United States brought an antitrust action to require divestiture. It was urged in defense that the Commission had been empowered to consider and adjudicate antitrust issues and that its approval immunized the transaction. The Court rejected the defense, Mr. Justice Harlan concurring in the judgment and summarizing the Court's holding as follows:

"[A] Commission determination of 'public interest, convenience, and necessity' cannot either constitute a binding adjudication upon any antitrust issues that may be involved in the Commission's proceeding or serve to exempt a licensee *pro tanto* from the antitrust laws, and . . . these considerations alone are dispositive of this appeal." *Id.,* at 353.

In *California* v. *FPC,* 369 U. S. 482 (1962), the question was whether the authority in the Federal Power Commission to approve mergers in the public interest foreclosed antitrust challenge to an approved

merger. The Court held that agency approval did not confer immunity from § 7 of the Clayton Act, even though the agency had taken the competitive factors into account in passing upon the application. A year later, in *United States* v. *Philadelphia Nat. Bank, supra,* the Court rejected the contention that "the Bank Merger Act, by directing the banking agencies to consider competitive factors before approving mergers . . . immunizes approved mergers from challenge under the federal antitrust laws." 374 U. S., at 350 (footnote omitted). More recently, we applied this principle in *Otter Tail Power Co.* v. *United States,* 410 U. S. 366 (1973). There the Court held that the authority of the Federal Power Commission to order interconnections between power systems of two companies did not exempt company refusal to interconnect from antitrust attack.

Under these and other cases it could not be clearer that "[a]ctivities which come under the jurisdiction of a regulatory agency nevertheless may be subject to scrutiny under the antitrust laws," *id.,* at 372, and that agency approval of particular transactions does not itself confer antitrust immunity.

The foregoing were the governing principles both before and after *Silver* v. *New York Stock Exchange,* 373 U. S. 341 (1963). There, stock exchange members were directed to discontinue private wire service to two nonmember broker-dealers, who were given no notice or opportunity to be heard on the discontinuance. The latter brought suit under §§ 1 and 2 of the Sherman Act, but the Court of Appeals held that the stock exchanges had been exempted from the antitrust laws by the Securities Exchange Act of 1934. This Court reversed. The Act contained no express immunity, and immunity would be implied "only if necessary to make the Securities Exchange Act work, and even then only to the minimum extent nec-

essary." 373 U. S., at 357. Conceding that there would be instances of permissible self-regulation which otherwise would violate the antitrust laws, the Court concluded that nothing in the Act required that the deprivations there imposed be immune from the antitrust laws. In arriving at this conclusion, it was noted that the Securities and Exchange Commission had no authority to review specific instances of enforcement of the exchange rules involved and that it was therefore unnecessary to consider any problem of conflict or coextensiveness with the agency's regulatory power. The Court observed, however, that if there had been jurisdiction in the Commission, with judicial review following, "a different case would arise concerning exemption from the operation of laws designed to prevent anticompetitive activity . . . ." *Id.,* at 358 n. 12.

Such a different case, we said, was before us in *Ricci* v. *Chicago Mercantile Exchange,* 409 U. S. 289, 302 (1973). That case arose in the context of the Commodity Exchange Act. We held that a district court entertaining a private antitrust action should stay its hand while the Commodity Exchange Commission exercised whatever jurisdiction it might have to adjudicate specific claims of violation of exchange rules; but that adjudication, we said, was not a substitute for antitrust enforcement, and the fact that the Commission had jurisdiction to approve or disapprove the challenged conduct and might hold the conduct to be consistent with exchange rules would not, in itself, answer the immunity question. *Id.,* at 302–303, n. 13.

On occasion, however, Congress has authorized an agency to adjudicate the legality of specifically defined transactions or commercial behavior in accordance with a competitive standard inconsistent with the controlling criteria under the antitrust laws. In these circumstances, the

Court has concluded that Congress intended to replace normal antitrust enforcement with the administrative regime provided by the statute, subject to judicial review. *Pan American World Airways, Inc.* v. *United States,* 371 U. S. 296 (1963), involved certain business conduct within the jurisdiction of the Civil Aeronautics Board. Under the Federal Aviation Act, various transactions by air carriers, if approved by the Board, were expressly immunized from antitrust attack. Also, the Board was given explicit authority under § 411 of that Act, 49 U. S. C. § 1381, to investigate and bring to a halt all "unfair . . . practices" and "unfair methods of competition," the power under this section to be administered in the light of the "competitive regime" clearly delineated elsewhere in the Act. See 371 U. S., at 308–309. The Court concluded that Congress, having directed itself to the matter of competition in the airlines industry and having provided a competitive standard to be administered by an agency, had intended to displace the usual enforcement of the antitrust laws through the courts, at least insofar as Government injunction suits were concerned. *United States* v. *Philadelphia National Bank, supra,* made it plain that *Pan American* had not disturbed the usual rule that, without more, agency power to approve, and agency approval itself, do not confer antitrust immunity. 374 U. S., at 351–352.

*Gordon* v. *N. Y. Stock Exchange, Inc., ante,* p. 659, decided today, is another instance where Congress has provided an administrative substitute for antitrust enforcement. Section 19 (b) of the Securities Exchange Act of 1934, 48 Stat. 898, as amended, 15 U. S. C. § 78s (b), contemplated the fixing by the exchange, and approval or prescription by the Securities and Exchange Commission, of "reasonable rates of commission" to be charged by exchange members. Price fixing

by competitors, however, is wholly at odds with the Sherman Act; under that statute prices fixed by agreement are inherently unreasonable, whatever the level at which they are set. This was the law long prior to the Securities Exchange Act:

> "The aim and result of every price-fixing agreement, if effective, is the elimination of one form of competition. The power to fix prices, whether reasonably exercised or not, involves power to control the market and to fix arbitrary and unreasonable prices. The reasonable price fixed today may through economic and business changes become the unreasonable price of tomorrow. Once established, it may be maintained unchanged because of the absence of competition secured by the agreement for a price reasonable when fixed. Agreements which create such potential power may well be held to be in themselves unreasonable or unlawful restraints, without the necessity of minute inquiry whether a particular price is reasonable or unreasonable as fixed and without placing on the government in enforcing the Sherman Law the burden of ascertaining from day to day whether it has become unreasonable through the mere variation of economic conditions." *United States* v. *Trenton Potteries Co.,* 273 U. S. 392, 397–398 (1927).

Thus Congress could not have anticipated that the antitrust laws would apply to stock exchange price fixing approved by the Commission. In this respect, there is a "plain repugnancy between the antitrust and regulatory provisions," *United States* v. *Philadelphia National Bank, supra,* at 351 (footnote omitted).

The rule of law that should be applied in this case, therefore, as it comes to us from these precedents, is that, absent an express antitrust immunization conferred

by Congress in a statute, such an immunity can be implied only if Congress has clearly supplanted the antitrust laws and their model of competition with a differing competitive regime, defined by particularized competitive standards and enforced by an administrative agency, and has thereby purged an otherwise obvious antitrust violation of its illegality. When viewed in the light of this rule of law, the argument for implied immunity in this case becomes demonstrably untenable.

## II

Section 22 (f) of the Investment Company Act provides that "[n]o registered open-end company shall restrict the transferability or negotiability of any security of which it is the issuer except in conformity with the statements with respect thereto contained in its registration statement nor in contravention of such rules and regulations as the Commission may prescribe in the interests of the holders of all of the outstanding securities of such investment company." The majority concludes from these words and their sparse legislative history that the "funds and the SEC" have the authority to impose "SEC-approved restrictions on transferability and negotiability," *ante,* at 724, 725, including the restrictions involved here effecting resale price maintenance and concerted refusals to deal, all aimed at stifling competition that might come from the secondary market. The majority concludes that "[t]here can be no reconciliation of [SEC] authority . . . to permit these and similar restrictive agreements" with their illegality under the Sherman Act and that therefore "the antitrust laws must give way if the regulatory scheme established by the Investment Company Act is to work." *Ante,* at 729, 730.

For several reasons, the majority's conclusions are infirm under the controlling authorities. It is plain

that the Act itself contains no express exemptions from the antitrust laws. It is equally plain that the Act does not expressly permit the specific restrictions at issue here in the way that it deals with the public offering price under § 22 (d). It would be incredible even to suggest that Congress intended to give participants in the mutual-fund industry, individually or collectively, *carte blanche* authority to impose whatever restrictions were thought desirable and without regard to the policies of the antitrust laws. The majority does not contend otherwise and rests its case on the power which it finds in the Commission to approve, or to fail to disapprove, the practices challenged here and to immunize them from antitrust scrutiny.

It is immediately obvious that the majority has failed to heed the teaching of our cases in several respects. It ignores the rule that "exemptions from antitrust laws are strictly construed" and that implied exemptions are " 'strongly disfavored.' "  *FMC* v. *Seatrain Lines, Inc.,* 411 U. S., at 733. Lurking in the *prohibition* of § 22 (f) against any restrictions on "transferability or negotiability" except those stated in the registration statement, the Court discovers the affirmative power to impose resale price maintenance restrictions, as well as the authority to engage in concerted refusals to deal and similar practices wholly at odds with the antitrust laws. Never before has the Court labored to find hidden immunities from the antitrust laws; and the necessity for the effort is itself at odds with our precedents.

The Court's holding that Commission approval automatically brings with it antitrust immunity is also contrary to those cases which have consistently refused to equate agency power to approve conduct with an exemption under the antitrust laws. Those cases, as demonstrated above, uniformly held that actual agency

approval of the very transaction which the statute empowers the agency to approve is not in itself sufficient to exempt the transaction from liability under the Sherman Act, absent express exemption, or its equivalent, under the regulatory statute itself. This is true even where the agency is required to take antitrust considerations into account in approving the transaction or agreement and, *a fortiori,* where there is no evidence that such factors played any part in agency approval.

Here, the Court finds authority in open-end funds, subject to Commission approval, to impose restrictions on "negotiability and transferability"; construes those words generously to include price fixing and concerted boycotts; and then concludes that Commission approval—rather, its failure to disapprove—automatically and without more confers antitrust immunity on the selling practices followed by the particular open-end funds in this case. This result disregards the fact that there is no express provision for immunity in the statute, no direction to the Commission to consider competitive factors, no statutory standard provided for the Commission to follow with respect to competition in the investment company business, no indication that the Commission has considered the competitive impact of the restrictions at issue here, and no other basis for concluding that Congress intended the unilateral business judgment of an investment company, followed by Commission approval, to substitute for and supplant the antitrust laws.

The position of the Securities and Exchange Commission, as described and embraced by the Court, is that "its authority will be compromised" if industry practices which the Commission has the power to approve are subject to scrutiny under the antitrust laws. See *ante,* at 729. But the Commission has made no effort to analyze and

explain the need for these seriously anticompetitive re-restrictions in the mutual-fund industry. It has never affirmatively and formally approved the specific practices involved in this case, by rule or adjudication. Until recently, it has seemingly left investors and the public to the tender mercies of the industry itself. In fashioning antitrust immunity for these practices, the majority acts in complete disregard of the basic approach mandated by our cases, including the principles approved by the unanimous Court in *FMC* v. *Seatrain Lines, Inc., supra:*

"The Commission vigorously argues that such agreements can be interpreted as falling within the third category—which concerns agreements 'controlling, regulating, preventing, or destroying competition.' Without more, we might be inclined to agree that many merger agreements probably fit within this category. But a broad reading of the third category would conflict with our frequently expressed view that exemptions from antitrust laws are strictly construed, see, *e. g., United States* v. *McKesson & Robbins, Inc.,* 351 U. S. 305, 316 (1956), and that '[r]epeals of the antitrust laws by implication from a regulatory statute are strongly disfavored, and have only been found in cases of plain repugnancy between the antitrust and regulatory provisions.' *United States* v. *Philadelphia National Bank,* 374 U. S. 321, 350–351 (1963) (footnotes omitted). As we observed only recently: 'When . . . relationships are governed in the first instance by business judgment and not regulatory coercion, courts must be hesitant to conclude that Congress intended to override the fundamental national policies embodied in the antitrust laws.' *Otter Tail Power Co.* v. *United States,* 410 U. S. 366, 374 (1973). See also *Silver* v. *New York Stock Exchange,* 373 U. S.

341 (1963); *Pan American World Airways, Inc.* v. *United States,* 371 U. S. 296 (1963); *California* v. *FPC,* 369 U. S. 482 (1962); *United States* v. *Borden Co.,* 308 U. S. 188 (1939). This principle has led us to construe the Shipping Act as conferring only a 'limited antitrust exemption' in light of the fact that 'antitrust laws represent a fundamental national economic policy.' *Carnation Co.* v. *Pacific Westbound Conference,* 383 U. S., at 219, 218." 411 U. S., at 732–733 (footnotes omitted).

### III

Exempting the NASD from antitrust scrutiny based on the existence of Commission power to approve or disapprove NASD rules is likewise unacceptable under our cases for very similar reasons. The majority relies on *Hughes Tool Co.* v. *Trans World Airlines,* 409 U. S. 363 (1973), and *Pan American World Airways* v. *United States,* 371 U. S. 296 (1963). But in *Hughes* exemption for the transactions there involved was based on the express immunities conferred by § 414 of the Federal Aviation Act; and in *Pan American* immunity followed from the Board's authority to adjudicate unfair competitive practices in accordance with the distinctive competitive standard Congress itself supplied in the regulatory statute. Nothing comparable is to be found in the relevant provisions of the statutes involved here.

It is especially interesting to find the Court on the one hand concluding that the selling practices under scrutiny here are essential to the working of the statutory scheme but on the other hand recognizing that the Commission itself has requested that the NASD rules be amended to prohibit agreements between underwriters and broker-dealers that preclude broker-dealers, acting as agents, from matching orders to buy and sell fund

shares in a secondary market at competitively determined prices and commission rates. *Ante,* at 718–719, n. 31.

The majority's opinion, as a whole, seems to me to reject the basic position found in our cases that "antitrust laws represent a fundamental national economic policy . . . ." *Carnation Co.* v. *Pacific Conference,* 383 U. S. 213, 218 (1966). I cannot follow that course and accordingly dissent.