**SECURITIES AND EXCHANGE COMMISSION, Plaintiff-Appellant,**

v.

**MOUNT VERNON MEMORIAL PARK, et al., Defendants-Appellees.**

Nos. 78–3569, 79–4016.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 9, 1980.

Decided Jan. 4, 1982.

Rehearing Denied Feb. 8, 1982.

Jacob H. Stillman, Washington, D. C., argued, for plaintiff-appellant; David A. Sirignano, Washington, D. C., on brief.

Robert P. Murphy, O'Brien & Hallisey, San Francisco, Cal., for defendants-appellees.

Before KENNEDY, PREGERSON and POOLE, Circuit Judges.

POOLE, Circuit Judge:

In this appeal, we must decide whether the Mount Vernon Memorial Park (Mount Vernon), a Sacramento cemetery and mortuary which issued debentures in connection with the sale of its services, is an "investment company" within the meaning of the Investment Company Act of 1940 (Act), 15 U.S.C. § 80a–1 et seq.[1] In a two-count complaint filed in the district court, the Securities and Exchange Commission (Commission) alleged that Mount Vernon had failed to comply with the regulatory provisions of the Act and violated provisions of the Securities Act of 1933, § 77t(b), and the Securities and Exchange Act of 1934, §§ 78u(d), 78u(e), in connection with its funeral debenture program. The district court denied the Commission preliminary injunctive relief as to both counts and the Commission filed a notice of appeal. The district court also dismissed count one (investment company claim) when it concluded Mount Vernon was not subject to regulation under the Act. The Commission filed a notice of appeal from that determination after the district court certified its order for immediate appealability pursuant to Fed.R.Civ.P. 54(b). Count two, dealing with the 33 and 34 Acts, has been settled and is not before us.

Appellees challenge our jurisdiction over the appeal from the denial of preliminary injunctive relief and urge that we sustain the district court's dismissal of count one.

We dismiss the appeal from the denial of preliminary injunctive relief and reverse the district court's decision that Mount Vernon is not subject to regulation as an investment company.

I

Mount Vernon is a California corporation operating a licensed mortuary and cemetery in Sacramento, California. Appellee Foy E. Bryant was the president and principal shareholder since Mount Vernon's incorporation and throughout the critical period at issue in this case.

In addition to the sale of its services for cash, Mount Vernon began in the mid-sixties to sell cemetery plots and funeral services on an anticipatory or "pre-need" basis. A pre-need customer would contract for purchase of a plot and a funeral service in the event of death. Under an installment sales arrangement, Mount Vernon agreed to provide a specified funeral service at a fixed price; customer was obligated to make payments spread over several years. Mount Vernon was free to use the monies received to cover its general operating expenses. If the "need" for service arose before all installments had been met, the payments made would be credited toward the price.

In October 1969, the California Attorney General issued an opinion interpreting California's Short Act, Cal.Bus. & Prof.Code § 7735 et seq., as applied to the sales of pre-need cemetery and mortuary services. He concluded that the Act required all consideration paid pursuant to installment sale funeral contracts to be held in trust until the services were actually performed. Furthermore, the opinion indicated that a refund of 90% of installment payments had to be available to any pre-need purchaser at any time under the contract arrangement. Under such an interpretation of California law, companies such as Mount Vernon could

---

1. All further statutory section references are to Title 15, United States Code, unless otherwise indicated.

no longer use installment payment revenue to meet current operating expenses.

Mount Vernon altered its pre-need sales contract in an effort to avoid the trust fund requirements of the Short Act promulgated in the Attorney General's decision. Exempted from the Short Act were sellers of pre-need funeral contracts who issued securities as a part of the program. Thus, once securities were registered with the California Department of Corporations, they could be offered for sale as part of a pre-need funeral program and the seller was free to use 85% of the proceeds from the sale of the debentures for any purpose, retaining only 15% in a sinking fund.

Beginning in September 1970, Mount Vernon offered "Pre-Need Funeral Service Debentures." Under the restructured program, a purchaser executed two documents: a funeral service contract and a subscription agreement. The contract obligated Mount Vernon to provide future services at a fixed price so long as the purchaser continued to make installment payments toward purchase of the debentures. Under the subscription agreement, purchaser agreed to buy a certain number (equivalent to the approximate contract price for funeral services) of "Pre-Need Funeral Service Debentures," in amounts of $100 each. The debentures were interest bearing; the term of the subscription could run up to eight years. Monthly payments, which could be as low as $7.50, were accumulated by Mount Vernon until they reached the subscription price, at which time a debenture was issued. Upon default on the installment payment obligation under the subscription agreement, Mount Vernon was released from its commitment to provide funeral services at a fixed price under the contract.

Once purchased, the debentures were redeemable for funeral and cemetery services or for cash at maturity, twenty years after purchase. If, upon the arrival of the contingency, the debentures were insufficient to cover the contract price of the services, they could be redeemed up to the amount of their value so long as the contract balance for the services was paid at the time serv-ices were rendered. The subscription agreement was cancellable at will upon notice by the purchaser. If cancelled, Mount Vernon immediately refunded only the installment payments made since the issuance of the last debenture; the balance was redeemable at maturity.

Between September 1970 and January 1975, Mount Vernon made four offerings of the debentures, each totaling one million dollars. The interest rate of the first offering was 4½% while the remaining offerings provided for interest of 3%, in each case payable either directly to the purchaser or creditable toward the next installment payment. Mount Vernon retained 15% of installment payments in a sinking fund; the remaining 85% was available to meet the company's operating expenses.

Mount Vernon discontinued its debenture contract offerings in 1975 after approximately 4,900 such contracts had been sold. In 1976, the Commission indicated in an administrative decision that it viewed debentures similar to those issued by Mount Vernon to be "face-amount certificates of the installment type," rendering issuers of such certificates investment companies by virtue of § 80a–3(a)(2). *See In re International Funeral Service of California, Inc.,* [1975–1976 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 80,363, at 85,960 (1976). Shortly thereafter, the Commission advised Mount Vernon that it considered the firm an investment company because of the outstanding funeral debentures.

In February 1976, Mount Vernon began to deposit revenue from the existing debenture contracts into a separate bank account. Thus, after paying 15% of the revenue into the sinking fund, as required by the subscription agreement, the balance has been held in this bank account, monies from which are used for investment with the profits on such investments paid to Mount Vernon.

On February 17, 1977, this suit was commenced by the Commission in the Eastern District of California. Count one alleged that Mount Vernon and Bryant violated the Act by issuing face-amount certificates of

the installment type without complying with the Act's registration requirements. Count two charged fraudulent and materially misleading activities in connection with the sale of these debentures, in violation of the Securities Acts of 1933 and 1934.

The Commission moved for a preliminary injunction against the appellees on both counts and appellees sought dismissal of count one for failure to state a claim, theorizing that Mount Vernon was not a regulable investment company.

On April 25, 1977, the district court announced that it would not grant the Commission preliminary injunctive relief and promised to file a memorandum and order. On August 4, 1977, findings of fact and conclusions of law were filed. As to count one, the court ruled that Mount Vernon was not an investment company and therefore, not only was the Commission not entitled to injunctive relief, but count one had to be dismissed. The court refused to grant the Commission injunctive relief as to count two because it concluded such relief was not necessary to protect the public.

On October 2, 1977, the Commission filed a notice of appeal from the denial of injunctive relief as to counts one and two. Judgment denying injunctive relief and dismissing count one was entered on October 10, 1977. On January 8, 1979, the Commission noticed a timely appeal from the dismissal of count one after the district court certified the dismissal for immediate appealability pursuant to Fed.R.Civ.P. 54(b). The two appeals were consolidated in this court for disposition and are before us now.

## II

The parties have settled their differences with regard to count two, the fraud claim in the complaint, and they agree that the appeal from the denial of preliminary injunc-

tive relief as to that count is no longer before this court; it is dismissed as moot.

## A

■ Appellees argue that the appeal from the denial of preliminary injunctive relief as to count one, the investment company claim, is not before us because the district court dismissed count one.[2] They contend that the denial of preliminary injunctive relief has merged into the court's dismissal of count one and that the injunctive appeal should be dismissed. We agree.

The doctrine of merger has long been recognized and applied by federal courts. See, e. g., Smith v. Illinois Bell, 270 U.S. 587, 46 S.Ct. 408, 70 L.Ed. 747 (1926); Shaffer v. Carter, 252 U.S. 37, 44, 40 S.Ct. 221, 222, 64 L.Ed. 445 (1920); United States v. City of Chicago, 534 F.2d 708, 711–12 (7th Cir. 1976); Moore Dry Dock v. Pillsbury, 98 F.2d 115 (9th Cir. 1938). The basis for the doctrine has been aptly explained by the Seventh Circuit:

> One of the considerations in entry of a preliminary injunction is the probability of the plaintiff's success on the merits. Yet on final decision, the district court has decided the merits. To attempt to review the district court's advance assessment of probabilities of plaintiff's success when the district court has now found in favor of plaintiffs on the merits seems a futile exercise. Good sense dictates that review of the decision on the merits would be more meaningful.

United States v. City of Chicago, supra, 534 F.2d at 712.

Using "good sense," it is pointless for us to decide what preliminary relief the Commission should have obtained on the investment company count when that count has been dismissed for failure to state a claim

---

2. The Commission filed its notice of appeal before formal entry of judgment denying a preliminary injunction, but after the district court had filed its findings and order denying such relief. Fed.R.App.P. 4(a)(2) indicates such a notice is timely. Although this rule was not in effect when the Commission filed its notice, we

have been encouraged to apply the rule to pending cases when justice requires. 47 U.S. L.W. 4485 (1979). In any event, the entire question of the timeliness of the notice is academic because we dismiss the injunctive appeal.

and is before us on appeal. Appeal No. 78–3569 is therefore dismissed as merged.[3]

### III

■ An investment company within the meaning of the Act is defined in § 80a–3.[4] For our purposes, it is undisputed that Mount Vernon is an investment company if it

> is engaged or proposes to engage in the business of issuing face-amount certificates of the installment type, or has been engaged in such business and has any such certificates outstanding[.]

§ 80a–3(a)(2). A face-amount certificate is defined in § 80a–2(a)(15):

> (a) When used in this subchapter, unless the context otherwise requires—
>
> (15) "Face amount certificate" means any certificate, investment contract, or other security which represents an obligation on the part of its issuer to pay a stated or determinable sum or sums at a fixed or determinable date or dates more than twenty-four months after the date of issuance, in consideration of periodic installments of a stated or determinable amount (which security shall be known as a face-amount certificate of the installment type)[.]

A threshold requirement for applicability of the above quoted section is that the instrument in question be a "certificate, investment, or other security." The parties do not appear to contest that the funeral service debentures are investment contracts or securities, and we do not find it necessary to examine the point. Appellees admit that Mount Vernon has outstanding certificates which literally fit the definition in subsection 15. They theorize, however, and the district court agreed, that the Act was intended to regulate only issuers of certificates defined in subsection 15 who use the proceeds from the sale of such certificates for reinvestment in other companies' securities and not in the issuers' own business (hereinafter "reinvestment requirement"). To give effect to this theory, several constructions of the statute are suggested: (1) The qualifying language to subsection 15, "unless the context otherwise requires," withdraws Mount Vernon's certificates from the face-amount certificate definition; (2) Any subsection (a)(2) investment company must be "in the business of issuing face-amount certificates of the installment type" and Mount Vernon is not primarily in that business; (3) Mount Vernon is exempt from the Act by virtue of § 80a–3(b)(1), which provides:

> (b) Notwithstanding paragraph (3) of subsection (a) of this section, none of the following persons is an investment company within the meaning of this subchapter:
>
> (1) Any issuer primarily engaged, directly or through a wholly-owned subsidiary, in a business or businesses other than that of investing, reinvesting, owning or holding, or trading in securities.

(4) To be faithful to the legislative history, an unarticulated reinvestment requirement must be read into subsection (a)(2).

---

**3.** Appellees also argue that if merger requires dismissal of the interlocutory appeal, the Fed. R.Civ.P. 54(b) certification must be remanded to the district court because it was based on the erroneous understanding that this court would consider the interlocutory appeal. We need not evaluate this argument because the settlement of count two leaves nothing remaining for decision in the district court and the certified appeal as to that count is therefore properly before us for decision. *See Anderson v. Allstate Insurance Co.*, 630 F.2d 677 (9th Cir. 1980).

**4.** This section provides in relevant part:

> (a) When used in this subchapter, "investment company" means any issuer which—

> (1) is or holds itself out as being engaged primarily, or proposes to engage primarily, in the business of investing, reinvesting, or trading in securities;
>
> (2) is engaged or proposes to engage in the business of issuing face-amount certificates of the installment type, or has been engaged in such business and has any such certificate outstanding; or
>
> (3) is engaged or proposes to engage in the business or investing, reinvesting, owning, holding, or trading in securities, and owns or proposes to acquire investment securities having a value exceeding 40 per centum of the value of such issuer's total assets (exclusive of Government securities and cash items) on an unconsolidated basis.

In addition to these suggested statutory constructions, and reliance on legislative history, appellees allude to what they consider inappropriate burdens the Act would place on a small firm such as Mount Vernon.

Despite the panoply of ingenious constructions offered by appellees, the issue in this case is comparatively narrow: Did Congress intend to regulate an issuer of face-amount certificates of the installment type using the proceeds from the sale of such certificates for other than reinvestment in the securities of other companies? Upon careful analysis of the statute and its history, we believe Mount Vernon is a regulable investment company and reverse the contrary holding of the district court.

### IV

It is elementary that the language of the securities laws provides the clearest indication of the regulatory sweep Congress intended. *See, e. g., Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 201, 96 S.Ct. 1375, 1384–1385, 47 L.Ed.2d 668 (1976); *Browder v. United States*, 312 U.S. 335, 338, 61 S.Ct. 599, 601, 85 L.Ed. 862 (1941). Appellees acknowledge, as they must, that the language of the Act provides a compelling case for classification of Mount Vernon as an investment company. Subsection (a)(2) does not purport to limit the Act's coverage based on the intended use of the money generated from the certificate sales. Quite the contrary, the language is absolute, defining an investment company as any enterprise with face-amount certificates of the installment type outstanding.

Highlighting subsection (a)(2)'s language, "in the business of issuing face-amount certificates of the installment type," appellees argue that Mount Vernon is not an investment company because its *primary* business is ministering to the needs of the dead and not issuing certificates. Appellees' argument would be more plausible if the adverb "primarily" appeared in the statute. Without it, it is equally reasonable to say that any issuer is in the business of issuing certificates at least to the extent certificates are actually issued.

To require an (a)(2) issuer to be "primarily in the business of issuing certificates" would violate traditional rules of statutory construction which apply when analyzing the securities laws. *SEC v. National Securities, Inc.*, 393 U.S. 453, 466, 89 S.Ct. 564, 571, 21 L.Ed.2d 668 (1969). Both (a)(1) and (a)(3) of the investment company definition classify issuers based on the extent to which they invest.[5] Subsection (a)(2) on the other hand does not refer to the number of outstanding certificates necessary to be an investment company. Indeed, it defines a face-amount investment company as one with *any* such certificates outstanding, whether or not the company is actively or presently engaged in selling certificates. This distinction is significant because it logically implies that Congress did not intend to quantify the activity necessary for regulation under (a)(2), as it did in (a)(1) and (3). *See League to Save Lake Tahoe v. Trounday*, 598 F.2d 1164, 1171 (9th Cir. 1979).

Subsection (a)(2) is also distinctive because it defines investment companies based on the type of security issued, while (a)(1) and (3) classify companies based on the disposition of the proceeds from any certificate sales. Adoption of appellees' theory that an (a)(2) issuer has to be primarily engaged in reinvestment would render (a)(2) superfluous as an independent basis for defining investment companies, a result disfavored in the law. *See, e. g., United States v. Marubeni America Corp.*, 611 F.2d 763, 767 (9th Cir. 1980). An (a)(2) issuer primarily in the business of reinvesting would be regulable under (a)(1), and perhaps also (a)(3).

Appellees acknowledge that, absent the clause "unless the context otherwise requires" in 2(a)(15), Mount Vernon's certificates are face-amount of the installment type. But while they contend that this contextual exclusion applies to Mount Vernon's certificates, we cannot agree that the language leads to such a result. The phrase

---

**5.** *See* Note 4 *supra*.

is at best neutral, with meaning only when applied to particular facts in light of Congress' intentions.

The language of the exemption in (b)(1) also does not aid appellees argument that Mount Vernon is not regulable. If that section applied to (a)(2) issuers, it would certainly exempt companies similar to Mount Vernon, primarily engaged in other than investing. But the (b)(1) exemption applies "[n]otwithstanding paragraph (3) of subsection (a) . . . ." Mount Vernon is regulable under (a)(2), as a face-amount company, not under (a)(3).

That the (b)(1) exemption applies only to (a)(3) issuers is apparent when this section is compared with other exemptions contained in subsection (c), which provides "[n]otwithstanding subsection (a) . . . ." The legislative history also supports this conclusion. The (b)(1) exemption was in the originally proposed version of the Act, a version which did not include (a)(2). In Committee testimony on the final version of the bill, the (b)(1) exemption was described as a means to insure that the formula for defining companies in (a)(3) did not catch companies primarily engaged in other than investing. See Hearings before a Subcommittee on Interstate and Foreign Commerce on H.R. 10065, House of Representatives, 76th Cong., 3d Sess. 101–02 (1940) (hereinafter "House Hearings"); Hearings before a Subcommittee on Banking and Currency on S. 3580, United States Senate, 76th Cong., 3d Sess. 177 (1940) (hereinafter "Senate Hearings") ((a)(2) was not included in the original bill).

In sum, an examination of the language and structure of the Act, though not conclusive of the issue, strongly points toward classification of Mount Vernon as an (a)(2) investment company.

## V

 Legislative history remains for examination. That examination is made necessary for, " 'A thing may be within the letter of the statute and yet not within its spirit, nor within the intention of its makers.' " *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 849, 95 S.Ct. 2051,

2059, 44 L.Ed.2d 621 (1975), *quoting, Church of Holy Trinity v. United States,* 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892). This is not to say that every permissible application must have been contemplated by Congress when a securities statute is adopted. *Barr v. United States,* 324 U.S. 83, 90, 65 S.Ct. 522, 525, 89 L.Ed. 765 (1945). Remedial statutes, such as the Act, must be applied in recognition of the changing dynamics of the marketplace. *See Aaron v. SEC,* 446 U.S. 680, 695, 100 S.Ct. 1945, 1955, 64 L.Ed.2d 611 (1980); *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 151, 92 S.Ct. 1456, 1471, 31 L.Ed.2d 741 (1972). But application of the Act may not run afoul of apparent congressional purposes in imposing the regulatory framework.

Due to the clear indications in the language of the Act that Mount Vernon is an (a)(2) investment company, our look at the legislative history must be tempered by the admonition " 'the plainer the language [of a statute], the more convincing contrary legislative history must be' " before we depart from its apparent statutory command. *Church of Scientology v. U. S. Department of Justice,* 612 F.2d 417, 422 (9th Cir. 1979), *quoting, United States v. United States Steel Corp.,* 482 F.2d 439, 444 (7th Cir.), *cert. denied,* 414 U.S. 909, 94 S.Ct. 229, 38 L.Ed.2d 147 (1973). Congressional ambiguity or indirection may not alter the consequence or meaning of clear statutory language. *See St. Paul Fire & Marine Ins. Co. v. Barry,* 438 U.S. 531, 545, 98 S.Ct. 2923, 2931, 57 L.Ed.2d 932 (1978); *NLRB v. Plasterer's Union,* 404 U.S. 116, 129–30, 92 S.Ct. 360, 368–369, 30 L.Ed.2d 312 (1971).

## VI

In the Public Utility Holding Company Act of 1935, § 79z–4, Congress instructed the Commission to investigate the activities and problems of investment companies and to propose regulatory legislation. A detailed investigation lead to proposed legislation, which was subsequently modified in light of suggestions and criticism from the investment industry. It was only in this modified version of the bill that (a)(2) appeared as part of the investment company

definition. The inclusion was made "in order to eliminate any doubt that the face-amount-certificate companies are within the category of investment companies contemplated by this legislation ...." House Hearings, *supra*, at 101.

The ultimate objective of the Act was to regulate "liquid pools of public savings entrusted to the [investment] company management for investment in productive enterprise." Note, *The Investment Company Act of 1940*, 50 Yale L.J. 440, 440 (1941). Viewing the Act in light of its broadest objectives, we acknowledge that Congress focused primary attention on companies "invest[ing] in securities of other corporations and issu[ing] securities of [their] own." *United States v. National Association of Securities Dealers*, 422 U.S. 694, 697–98, 95 S.Ct. 2427, 2432–2433, 45 L.Ed.2d 486 (1975).[6] But this is hardly a surprising revelation in light of (a)(1) and (a)(3), which define investment companies as those significantly engaged in the business of investing in the securities of others.

Our case does not resolve itself so easily by allusions to much of the history. A more carefully focused inquiry is called for: what regulation did Congress intend for issuers of face-amount certificates of the installment type—(a)(2) investment companies?

The most important piece of legislative history in analyzing (a)(2) is "A Report on Companies Issuing Face Amount Certificates," prepared by the Commission and transmitted to the House Committee on Interstate and Foreign Commerce in 1938, H.R.Doc.No.459, 76th Cong., 3d Sess. (1940) (hereinafter "Face-Amount Report"). That report is a supplement to the Report on the Study of Investment Trusts and Investment Companies. The study is an essential basis for any analysis of the Act. *See* § 80a–1; *National Association of Securities Dealers, supra*, 422 U.S. at 705–06, 95 S.Ct. at 2436–2437 (citations to the multiple parts of the study are included in this case).

This report studies the activities of several issuers of face-amount certificates of the installment type. Appellees correctly note that the face-amount companies considered in the report are different from Mount Vernon because they used revenue from certificate sales for reinvestment. But it does not follow as appellees urge that Mount Vernon is not regulable. That theory disintegrates because it assumes that an essential characteristic of a regulable face-amount company is reinvestment of the installment sales proceeds. Yet the legislative history does not indicate that Congress intended reinvestment to be an essential requirement for face-amount companies.[7] And while there are parts of the legislative history alluding to the reinvestment activities of some face-amount companies, none of these references

---

**6.** The Supreme Court's general discussion of the Act in *National Association of Securities Dealers* does not foreclose our further analysis of (a)(2) investment companies. The face-amount investment company considered in (a)(2) is a small, distinctive part of the Act and the Court did not have occasion to consider it in *National Association of Securities Dealers*.

**7.** Both the Senate and House Reports on the Act describe face-amount companies without reliance on any reinvestment requirement. *See* S.Rep.No.1775, 76th Cong. 3d Sess. 11 (June 6, 1940) (hereinafter "Senate Report"); H.Rep. No.2639, 76th Cong., 3d Sess. 3, 10 (June 18, 1940) (hereinafter "House Report").

Both reports summarize the lengthy, but instructive definition of such companies contained in the Face-Amount Report:

III. DESCRIPTION OF COMPANIES INCLUDED IN THE REPORT

The companies covered by this report issue and distribute an investment contract or certificate called a face amount certificate. Irrespective of their designation, these certificates are, in essence, simply unsecured obligations of the companies which issue them to pay a specified sum (called the face amount or maturity value or amount) to the holder at a specified future date (called the maturity date), provided the purchaser, promptly and without any delinquency, makes all of the payments required by these contracts or certificates. Under certain conditions, after the contract has been in force for a stated period (which varies from one to two years), the holder of the certificate is entitled to receive, prior to the maturity date, a specified amount (surrender value) on the certificate, which is less than the face or maturity amount. The purchaser pays for a certificate either in an

emphasizes reinvestment as a defining characteristic of such companies. Rather, we find the legislative history consistent with what the structure and language of the Act suggest, that Congress intended to regulate face-amount companies because of the type of certificates they issue or have issued—a face-amount certificate of the installment type.[8] So viewed, nothing in the legislative history to which we have been directed permits us to depart from the command of the Act.

### VII

Since we have rejected Mount Vernon's theory that an (a)(2) investment company must be primarily engaged in reinvestment in other companies' securities, Mount Vernon cannot seriously contest that it falls within the terms of the Act.[9] We therefore reverse the judgment of the district court dismissing count one of the Commission's complaint and remand this case to that court for further proceedings consistent with this opinion.

DISMISSED IN PART, REVERSED AND REMANDED.

---

initial lump sum or in a series of periodic installments, depending upon the type of certificate. The maturity amount of each certificate is greater than the total sum required to be paid by the certificate holder. Variations of the obligations and privileges of the issuer and of the investor are numerous and will be described in detail hereinafter.
Face-Amount Report, *supra*, at 1–2 (footnotes omitted).
 Conspicuously absent from this definition is a reinvestment requirement.

8. The Face-Amount Report devotes considerable attention to the characteristics of the purchasers of installment certificates; a comparison of this type of investment with others; description of the frequent lapses in payment by purchasers and the accompanying burdensome losses sustained; the dangers of undercapitalization among face-amount companies; and the general lack of understanding among many purchasers of the complete ramifications of their certificate-holder rights and obligations. *See generally* Face-Amount Report, *supra*, at 27–32, 53–74. Similar themes are repeated elsewhere in the legislative history. *See* Senate Report, *supra*, note 7, at 10–11; House Report, *supra*, note 7, at 8–9; House Hearings, *supra*, at 160–61.
 This recurring litany of congressional concern with face-amount installment certificates, and the plight of those purchasing them, repre-

sents the focus of congressional concern about face-amount certificates and the companies issuing them. It indicates that (a)(2) was designed to control the proliferation of face amount installment certificates, not because of the reinvestment activities of issuers, but because of the nature of the certificates themselves.

9. The parties in this case devoted some attention to the deference, if any, we must pay to the Commission's interpretation that issuers of funeral service debentures of the installment type are (a)(2) investment companies. Because we have independently determined that the Act is properly applied to Mount Vernon, we need not consider our proper relationship to the Commission's administrative interpretations of the Act.
 Appellees have also suggested that the burdensome regulations imposed by the Act are inappropriately applied to Mount Vernon. Yet no particular (a)(2) company regulation has been specified as unfairly applied. While it is certainly true that the Act will impose administrative burdens on Mount Vernon, few regulatory schemes are without such consequences. Without specifying particular unfairness, it does not follow that because a regulation burdens the regulated it may not be imposed.