9 P.3d 648

2000-NMCA-065

**RAUSCHER, PIERCE, REFSNES, INC., Petitioner–Appellant,**

v.

**The TAXATION AND REVENUE DEPARTMENT OF the STATE of New Mexico, Respondent–Appellee.**

No. 19,625.

Court of Appeals of New Mexico.

April 26, 2000.

Certiorari Granted No. 26,344, Aug. 1, 2000.

Mary E. McDonald, Sutin, Thayer & Brown, P.C., Santa Fe, for Appellant.

Patricia A. Madrid, Attorney General, Bridget Jacober, Special Assistant Attorney General, NM Taxation & Revenue Department, Legal Services Bureau, Santa Fe, for Appellee.

## OPINION

BOSSON, J.

{1} We consider as a matter of first impression in New Mexico whether the receipts of a securities brokerage firm from the sale of mutual funds to its customers are taxable for gross receipts tax purposes. *See* NMSA 1978, §§ 7–9–1 to –89 (1966, as amended through 1999). The New Mexico Taxation and Revenue Department (the Department) assessed gross receipts tax, together with penalties and interest, on revenues that Rauscher, Pierce, Refsnes, Inc. (Taxpayer) earned as a result of transactions in mutual funds from January 1, 1987 through June 30, 1992. Upon Taxpayer's protest, a hearing officer determined that Taxpayer was earning "commissions or fees" while acting as a "broker," within the meaning of the Gross Receipts and Compensating Tax Act (the Tax Act), and denied the protest. *See* § 7–9–3(F)(1)(b). Taxpayer appeals, alleging pri-marily that it was not acting as a broker with respect to its mutual fund sales and that its earnings were not "commissions or fees" within the meaning of the Tax Act. We affirm the Decision and Order of the hearing officer denying Taxpayer's protest.

## BACKGROUND

{2} Taxpayer is a national brokerage firm whose corporate headquarters at the time of the hearing were located in Dallas, Texas and are now situated in Minneapolis, Minnesota. Taxpayer is a licensed broker-dealer under the New Mexico Securities Act, NMSA 1978, § 58–13B–3 (1986), with one New Mexico office located in Albuquerque. From January 1, 1987 through June 30, 1992, Taxpayer engaged in numerous transactions in mutual funds on behalf of customers.

{3} In a typical transaction, as found by the hearing officer, a sales representative at Taxpayer's New Mexico branch office takes a customer's order and transmits it through a series of clearing offices to the principal fund underwriter. After acceptance by the underwriter, Taxpayer then mails a "transaction confirmation" to its customer confirming the mutual fund purchase, showing the net amount due and the settlement date. Taxpayer transmits payment for the mutual fund shares to the principal underwriter by the settlement date, and Taxpayer's customer transmits payment to Taxpayer for the mutual fund shares. Title to the shares rests briefly in Taxpayer and is then registered in the customer's name, and the transaction is complete. Taxpayer pays to the principal underwriter the public offering price of the mutual fund shares ("net asset value" of the mutual fund shares on the trade date, plus any front end sales charge or "load") less the amount of dealer concessions specified in the agreement between Taxpayer and the principal underwriter. However, Taxpayer collects from its customer the full public offering price of the shares purchased. The dealer concession represents the portion of the front end sales charge that Taxpayer retains for handling the mutual fund purchase transaction.

{4} Taxpayer contends that it was in the business of selling mutual funds that it pur-

chased from the underwriter at one price and then resold to customers at another price. Thus, Taxpayer argues that the transactions in question were "sales" of its own securities that by statute are exempt from the Tax Act. *See* § 7–9–25 (exempting from gross receipts tax "receipts [received] from the sale of stocks, bonds or securities"). The Department contends, and the hearing officer found, that the substance of the transactions, as opposed to its form, was not a true sale of the Taxpayer's own securities. Instead, Taxpayer was actually earning "commissions or fees" (the "dealer concessions") which are taxable when earned by a "broker" from the sale or promotion of stocks, bonds or securities owned by others. *See* § 7–9–3(F)(1)(b). For the reasons that follow, we agree with the Department.

## DISCUSSION

### Standard of Review

■ {5} There is a statutory presumption that an assessment of tax made by the Department is correct. *See* NMSA 1978, § 7–1–17(C) (1992). This Court will reverse a hearing officer's decision only if it is "(1) arbitrary, capricious or an abuse of discretion; (2) not supported by substantial evidence in the record; or (3) otherwise not in accordance with the law." NMSA 1978, § 7–1–25(C)(1), (2), (3) (1989); *accord ITT Educ. Servs., Inc. v. Taxation & Revenue Dep't,* 1998–NMCA–078, ¶ 4, 125 N.M. 244, 959 P.2d 969. Any claim of exemption from gross receipts tax is strictly construed in favor of the Department. *See Stohr v. New Mexico Bureau of Revenue,* 90 N.M. 43, 46, 559 P.2d 420, 423 (Ct.App.1976).

### State Tax Statutory Sections

{6} Pursuant to Section 7–9–4, an excise tax of 5 percent (5%) of gross receipts is imposed as a gross receipt tax upon any person or entity engaged in business in New Mexico. Section 7–9–3(F)(1)(b) defines gross receipts to include "total commissions or fees derived from the business of buying, selling or promoting the purchase, sale or leasing, as an agent or broker on a commission or fee basis, of any property, service, stock, bond or security." On the other hand, Section 7–9–25 exempts from the tax "receipts from the sale of stocks, bonds or securities." Pursuant to these statutory sections, if Taxpayer was acting as an agent or broker, receiving commissions or fees from selling or promoting the sale of securities, then a taxable event occurs with respect to those commissions or fees. However, if Taxpayer was not acting as an agent or broker, but rather was purchasing securities and reselling them for a profit (not a commission or fee), then no taxable event occurs under the Tax Act with respect to that profit. *See Wing Pawn Shop v. Taxation & Revenue Dep't,* 111 N.M. 735, 739, 809 P.2d 649, 653 (Ct.App.1991) ("[G]ross receipts include only commissions if sale is by agent or broker." (Internal quotation marks and citation omitted.)). Therefore, we must determine two pivotal questions: (1) whether Taxpayer was acting as an agent or broker, and (2) whether Taxpayer received commissions or fees from the transactions.

### Taxpayer Was Acting As a Broker

■ {7} The hearing officer determined that the Taxpayer was not acting as an "agent," in part because, as we shall see, federal securities law requires that Taxpayer purchase mutual fund shares as a "principal." The Department's determination rests instead on the hearing officer's finding that Taxpayer was a "broker" under the Tax Act. Thus, for the Tax Act to apply, we must affirm that finding.

{8} Taxpayer contends that it was not acting as a broker because under federal securities law it takes title to the securities in its own name, as a dealer not a broker, and then sells those securities to its clients. Taxpayer argues that there are two separate transactions, the first being the sale of the securities from the principal underwriter to Taxpayer, and the second being the sale of securities from Taxpayer to its clients. As we will discuss in more detail, the transactions are structured in this fashion to satisfy the needs of federal regulatory law, and we conclude that Taxpayer's characterization of the transactions elevates form over substance. To understand the true nature of the transactions, we will undertake a brief overview of the federal statutes, regulations

and rules that regulate the sale of mutual funds. We will then turn to the applicable New Mexico statutes that employ the term "broker" in the securities context. Finally, we will examine whether Taxpayer's receipts are properly characterized as "commissions or fees" within the Tax Act.

**Relevant Federal Law**

{9} The sale of mutual funds is highly regulated at the federal level, both by federal statute, the Investment Companies and Advisers Act of 1940 (15 U.S.C. § 80a–1 through –64) (1988) (Investment Company Act), various federal regulations, and by industry rules of the National Association of Securities Dealers (NASD). In addition, entities like Taxpayer engage in the sale of mutual funds to customers pursuant to detailed contracts with the principal underwriters which further define the conditions under which they are permitted to do business in mutual funds. As a result of all these provisions, Taxpayer and similar entities engage in the buying and selling of mutual funds in a highly structured and closely controlled fashion.

{10} The Investment Company Act was promulgated over half a century ago to remedy abuses on the part of the mutual fund industry insiders by eliminating the secondary market in mutual fund shares. *See United States v. NASD*, 422 U.S. 694, 704, 95 S.Ct. 2427, 45 L.Ed.2d 486 (1975), Prior to the enactment of that Act, there existed what was known as the "two-price system." *Id.* at 706, 95 S.Ct. 2427 (internal quotation marks omitted). The price of shares of a mutual fund (net asset value) depended on market quotations of stock in the mutual fund's portfolio, much as they do today. As the stock prices fluctuated, so did the mutual fund share prices. The net asset value was computed daily and depended upon the fund's portfolio value at the close of exchange trading. At a specified hour on the following day, the sales price was established based on the closing value of the previous day. Thus, an insider aware that tomorrow's price was going to be higher could buy at the lower price even though the lower price did not reflect actual value. Other shareholders' equi-

ty interest would be diluted. Insiders would benefit because, unlike the public, they did not have to pay the load fee and could therefore take advantage of quick in and out trading. The general public could not share in the gain even if they were knowledgeable, because they had to pay the "load" which usually exceeded the daily fluctuation in net asset value. *See id.* at 706–09, 95 S.Ct. 2427.

{11} Section 22 of the Investment Company Act, 15 U.S.C. § 80a–22, was adopted to address this problem. Section 80a–22 regulates the distribution, redemption, and repurchase of mutual funds. It prescribes the conditions under which an underwriter may sell to intermediary companies like Taxpayer for resale to the customer. Under Section 80a–22(b), the price is controlled by having the underwriter sell to Taxpayer at a fixed price, the public offering price less the predetermined dealer concession. Notably, the dealer concession is defined in the Investment Company Act as a "commission, discount or spread." *Id.* Under Section 80a–22(d), Taxpayer can sell the mutual fund shares to its customers only at the public offering price. The Taxpayer has little or no discretion over how the transaction is structured, and it has no control over the purchase price nor the sales price. In addition, Rule 2830(c) of the NASD manual requires the principal underwriter to sell mutual funds only to dealers with whom, like Taxpayer, they have a sales agreement in effect that establishes the dealer concession. Under Section 80a–22(a)(2), NASD may require its members, like Taxpayer, to hold the mutual fund shares a certain minimum amount of time before resale to the public; this eliminates quick in and out trading. Under Rule 2830(g) of the NASD manual, an intermediary, like Taxpayer, must be a NASD member and may only purchase mutual funds either for its own account or to cover purchase orders previously received from customers. Significantly, all of the purchases in question here were to cover purchase orders previously made by customers; none were made for Taxpayer's own investment purposes.

{12} The Investment Company Act defines brokers and dealers separately. Section

80a–2(a)(6) defines "broker" as "any person engaged in the business of effecting transactions in securities for the account of others." Section 80a–2(a)(11) defines "dealer" as "any person regularly engaged in the business of buying and selling securities for his own account, through a broker or otherwise." Section 80a–22(d), which restricts the price at which mutual funds can be sold to the public (net asset value plus the applicable "load"), on its terms only applies to dealers. The NASD, in an apparent attempt to remedy this situation, adopted contract provisions which require companies dealing in mutual funds to act only as principals in buying and "reselling" mutual fund shares. *See NASD,* 422 U.S. at 713, 95 S.Ct. 2427 (restriction on sales price applies only when members are acting as statutory dealers and not when they are acting as statutory brokers). The contracts between Taxpayer and various investment companies denominate Taxpayer as a principal in buying and reselling mutual fund shares. To act as a principal, Taxpayer must also act as a dealer for federal purposes; it must purchase securities nominally for its own account and then, after receiving the net asset value plus the load from its previously identified customer, it transfers those securities into the customer's name.

{13} We are not persuaded to engraft the nuances of the federal securities laws onto our state tax code. The crux of the matter is that the language and the purpose of the federal regulatory overlay bears little relevancy to our state tax structure. The requirement that Taxpayer be a dealer, buying and selling at two fixed prices to a preexisting customer, holding the shares as a dealer for a minimum time period, earning a fixed "commission, discount or spread" (the dealer concession), is all part of the highly structured system put in place at the federal level to control price, protect share value, and forestall the systematic abuses that occurred in the industry. Federal law that requires Taxpayer, as a price control mechanism, to buy and resell shares as a dealer has little bearing on whether the transactions, for gross receipts tax purposes, are truly sales of the Taxpayer's own securities, as Taxpayer contends, or whether Taxpayer is a "broker or agent" earning a "commission or fee"

within the meaning of our state tax laws. Accordingly, we look elsewhere for guidance.

{14} According to Taxpayer, the hearing officer's conclusion that Taxpayer was a broker under the Tax Act conflicts with other decisions of this Court holding that a person who takes title to goods in his own name, and then sells those goods to third parties, is not a broker. *See New Mexico Enter., Inc. v. Bureau of Revenue,* 86 N.M. 799, 528 P.2d 212 (Ct.App.1974). Taxpayer also argues that a limited definition of a real estate broker was given in *Vihstadt v. Real Estate Comm'n,* 106 N.M. 641, 643–44, 748 P.2d 14, 16–17 (1988), and *Watts v. Andrews,* 98 N.M. 404, 407, 649 P.2d 472, 475 (1982) (limiting a broker to one who acts as an intermediary between the principal and third persons in order to consummate the sale or purchase of property). Thus, according to Taxpayer, this Court should employ such a limited definition as well. We decline to limit our review of state law. Taxpayer's argument fails to recognize that the legislature has elsewhere defined a broker or broker-dealer in the securities context more broadly than a broker in a real estate or similar setting.

{15} The Tax Act does not define the term "broker." The New Mexico Securities Act of 1986, NMSA 1978, § 58–13B–2(B) (1999), under which Taxpayer is registered to do business in New Mexico, does not provide separate definitions for broker and dealer. Rather, that act combines the terms "broker" and "dealer" as they are used in federal law and calls the combined position a "broker-dealer." Section 58–13B–2(B), defines " 'broker-dealer' " as "a person engaged in the business of effecting transactions in securities for the account of others or for the person's own account."

{16} Article 8 of the Uniform Commercial Code (U.C.C.), NMSA 1978, § 55–8–303 (1987), as it was in effect at the time of Taxpayer's receipts, defined "broker" broadly as "a person engaged for all or part of his time in the business of buying and selling securities, who in the transaction concerned acts for, or buys a security from, or sells a security to a customer." In 1996, the definition portion of the U.C.C. was amended so

that NMSA 1978, Section 55–8–102(a)(3) (1996) now defines "'broker'" simply as "a person defined as a broker or dealer under the federal securities laws." Finally, the Uniform Transfer to Minors Act, NMSA 1978, § 46–7–12(C) (1989), defines "'broker'" as "a person lawfully engaged in the business of effecting transactions in securities or commodities for the person's own account or for the account of others."

■ {17} Based on the foregoing, we observe that each of the New Mexico statutes defining the term "broker" in a securities setting makes no distinction between a company selling securities for its own account or for the account of others. Essentially, all that is required to be a broker under state law is to effect transactions in securities. In fact, no New Mexico statute even provides for a securities "dealer" separately from a "broker." Thus, the term "broker" under state law appears to subsume within it both a broker and a dealer as defined in the federal law. Accordingly, we draw the reasonable inference that, to our state legislature, the differences between broker and dealer that form a part of federal regulatory law were of little consequence to the task of drafting a tax code. "In interpreting statutes, we seek to give effect to the Legislature's intent and in determining intent, we look to the language used and consider the statute's history and background." *Key v. Chrysler Motors Corp.*, 1996–NMSC–038, 121 N.M. 764, 768–69, 918 P.2d 350, 354–55. In addition, as we have previously noted, there is a presumption in state tax law that all receipts received by a person engaged in a business are subject to the gross receipts tax. *See* § 7–9–5.

{18} For all these reasons, we are drawn to the conclusion that the term "broker" as used in Section 7–9–3(F)(1)(b) should be construed as broadly as it is elsewhere in our statutes. It should include a company like Taxpayer, whether it engages in transactions in securities for its own account or for others, or whether the company takes title to securities in its own name for a brief period of time and then transfers title to its clients. All are brokers for purposes of state tax law. As previously stated, however, Taxpayer's receipts are taxable only if we conclude as well,

that while acting as a "broker," Taxpayer was earning "commissions or fees" instead of profits from the sale of its own securities.

**Taxpayer's Receipts Were Commissions or Fees**

■ {19} Taxpayer contends that it was simply purchasing the securities, holding them in its own name, and then selling them for a profit, which all agree would not be taxable. *See* § 7–9–25 (receipts received from the sale of stocks, bonds or securities are exempt from taxation). Taxpayer bases this assertion on the fact that at least for a brief period of time, the mutual funds shares are held in "street name," or the name of the broker-dealer. Once Taxpayer receives payment from the customer who placed the order, the securities are then transferred to the name of the customer. According to Taxpayer, it was engaging in two separate transactions: it purchased shares from the underwriter and then sold those shares to its customer. Taxpayer contends that the dealer concession it received from the issuer was simply a price discount and that when Taxpayer sold the securities to its customer for the public offering price, the dealer discount represented its profit and was not subject to gross receipts tax.

■ {20} According to Taxpayer, the hearing officer's own findings support Taxpayer's position. *See* Finding of Fact 25 ("[T]he dealer concession represents the difference in the price the Taxpayer paid to the principal underwriter for the purchase of the mutual fund shares and the price the Taxpayer received from its customers for those shares."). Although that finding can be interpreted as supporting Taxpayer's argument that the dealer concession was a profit and not a commission or fee, it is capable of more than one meaning. The finding can reasonably be interpreted to state that the amount of commission or fee Taxpayer receives is equal to the dealer concessions. This latter interpretation is supported by other findings of fact by the hearing officer. *See* Finding of Fact 26 ("The dealer concession represents the portion of the front end sales charge included in the prospectus price or public offering price at which the mutual

fund shares are sold to the Taxpayer's customers which the Taxpayer receives as the dealer handling the mutual fund transaction."); Finding of Fact 27 ("NASD Rule 2830(B)(2) defines 'brokerage commissions' to include dealer concessions such as those the Taxpayer receives as the dealer handling mutual fund purchase transactions."). "Unless clearly erroneous or deficient, findings of the trial court will be construed so as to uphold a judgment rather than reverse it." *Herrera v. Roman Catholic Church,* 112 N.M. 717, 721, 819 P.2d 264, 268 (Ct.App. 1991).

{21} As we discussed above, 15 U.S.C. § 80a–22 specifies the price under federal law at which dealers can purchase and sell mutual funds. To ensure that a dealer can profit from the transaction, the statute also provides that the issuer or principal underwriter can sell the shares to the dealer for the public offering price, less a "commission, discount or spread." These three words appear to be used interchangeably. Whether a transaction is taxed should not depend upon whether it is called a commission, discount or spread. If this were the case, then the Taxpayer, or at least the issuer or principal underwriter, could control whether the transaction was taxable simply by how it is labeled.

{22} In the typical sale of securities by a true owner (not a broker) within the meaning of Section 7–9–25, the amount of profit is dependent upon how much the net asset value of the securities has appreciated according to market forces. Here, by contrast, the amount of the dealer concession (the "commission, discount or spread") is a fixed percentage of the net asset value that is determined by the issuer of the securities and is only indirectly affected by market appreciation. One of the purposes of offering the "dealer concession" is to encourage the broker-dealer to sell the fund vigorously, and provide compensation to the broker-dealer for providing the agreed-upon services to Taxpayer's customers (i.e., the shareholders of the fund). In contrast, "no load" funds are usually sold directly by the fund to the customer without a broker-dealer. *See NASD,* 422 U.S. at 699 n. 4, 95 S.Ct. 2427.

The entire scheme of paying the broker-dealer a fixed dealer concession has all the appearances of a commission or fee. Taxpayer's contention that the transactions are true sales simply elevates form over substance and is not persuasive. *See Dugger v. City of Santa Fe,* 114 N.M. 47, 52, 834 P.2d 424, 429 (Ct.App.1992) ("A basic tenet of judicial review is not to exalt form over substance.").

{23} In addition to the appearance of the transaction, our conclusion is buttressed by the fact that Taxpayer reports the dealer concessions as ordinary income and not capital gains from an appreciating investment. Transactions must be treated uniformly for all purposes under the tax laws. *See Stohr,* 90 N.M. at 46, 559 P.2d at 423 ("The taxpayer must not attempt to show one scheme for federal tax purposes, and a nontaxable event for purposes of state gross receipts tax."). In addition, NASD Rule 2830(B)(2) defines "brokerage commission" to include dealer concessions like those received by Taxpayer.

{24} We also observe that in at least two of the contracts between Taxpayer and the principal underwriters, the terms "commissions" and "dealer concessions" are used interchangeably. One contract provides that when there is no contingent, deferred sales fee, Taxpayer must return the "dealer concession" it received if the customer sells within a year. If, as Taxpayer argues, it was truly selling the securities and making a "profit," Taxpayer would not be obligated to return that "profit" to the issuer upon resale or redemption by Taxpayer's customer.

{25} Finally, we agree with the observation of the hearing officer that "there is nothing in [Section] 7–9–3(F) to indicate that the legislature intended to distinguish, for gross receipts taxation purposes, the fees or commissions received by securities broker-dealers from mutual fund transactions and those they receive for their role in handling transactions in any other types of securities, stocks or bonds." Commissions of broker-dealers like Taxpayer from other kinds of security transactions not involving mutual funds are routinely subject to gross receipts tax. Nothing in the statute would appear to indicate a conscious legislative choice to cre-

ate an exception for the fees earned by mutual fund brokers. Without any solid indication of legislative intent, we are loath to infer preferential tax treatment for one class of transactions similarly situated to others who are subject to tax.

{26} For all of these reasons, we conclude that the "dealer concessions" that Taxpayer received were "commissions or fees" derived from the sale, or promoting the sale, of stocks, bonds or securities, subject to gross receipts taxes pursuant to Section 7–9–3(F)(1)(b).

### Taxpayer's Other Arguments

{27} Taxpayer argues that, by adopting a definition of broker it contends is contrary to established New Mexico law, the hearing officer engaged in unlawful, retroactive rule making. We disagree. Because the hearing officer's interpretation of the word "broker" is supported by the definition of that term in the New Mexico Securities Act, the U.C.C. and the Uniform Transfer to Minors Act, as well as policy considerations implicit in the Tax Act, we do not believe the hearing officer's interpretation was so novel as to constitute rule making. We hold that the hearing officer was not creating a new rule but rather was adjudicating the controversy before him.

{28} Taxpayer argues that because the hearing officer found that only 5% of Taxpayer's sales price is a fee for performing services, and the remaining 95% is for the value of the shares, the predominant ingredient of the transaction is the sale of securities, and thus the performance of services is only incidental to that sale. Pursuant to the predominant ingredient test, Taxpayer contends that the entire transaction should be treated as a sale of securities and as a nontaxable event. See § 7–9–3(K); *E G & G, Inc. v. Taxation & Revenue Dep't*, 94 N.M. 143, 607 P.2d 1161 (Ct.App.1979). We fail to see how Section 7–9–3(K), or *E G & G, Inc.* are applicable in this case. As shown above, the transactions are sales in name only; the dealer concessions are the equivalent of commissions or fees earned by a securities broker. Because we conclude that the transactions were not true sales of securities for a profit, the predominant ingredient test does not apply.

{29} Taxpayer's final argument is that its services were provided outside New Mexico, and therefore they were not subject to taxation within this state. We are not persuaded.

{30} Taxpayer contends that it only takes the order for the purchase of securities from its customers in New Mexico and that all other acts which culminate in the purchase of the shares by Taxpayer and transfer of the shares to its customer are completed outside New Mexico. According to Taxpayer, any money it receives is not for the taking of the order but for the completion of the transaction which takes place outside the state. However, Taxpayer received the fee or commission not solely for effectuating the sale of securities, but also for promoting the sale and providing services to its customers after the transactions are completed. According to the terms of at least one contract between Taxpayer and issuer, Taxpayer was obligated to maintain regular contact with its customers, answer questions from the customer regarding the fund, distribute sales and service literature provided by the issuer of the fund, assist in establishing and maintaining of shareholder accounts, assist shareholders in making changes to their account, and provide information or services that the shareholder or fund reasonably requests. All of those services took place in New Mexico.

{31} Even if we were to accept Taxpayer's argument, that it is receiving compensation only for its role in acting as a broker in the purchase and resale transactions, the fact that these acts necessary to complete the transaction are done out-of-state does not mean that the fees received are exempt from taxation. Taxpayer is receiving the fee for bringing together an investor (its customer) and an investment company. That the support services necessary to effectuate that transaction are located out-of-state does not change what Taxpayer is being compensated for: the sale or promotion of the sale of securities. These acts undisputably take place within New Mexico. See *ITT Educ. Servs., Inc.*, 1998–NMCA–078,

¶¶ 6–13, 125 N.M. 244, 959 P.2d 969. The focus must be on what services the customers are contracting for and where those services are taking place. Simply because activity necessary to complete the service takes place out-of-state does not mean that the services provided are immune from New Mexico's gross receipts tax. *See id.* ¶ 13; *see also Mountain States Adver. Inc. v. Bureau of Revenue,* 89 N.M. 331, 332–33, 552 P.2d 233, 234–35 (Ct.App.1976) (recognizing that the court must focus on the service for which the client is paying a fee).

## CONCLUSION

{32} We affirm the Decision and Order of the hearing officer.

{33} **IT IS SO ORDERED.**

APODACA and WECHSLER, JJ., concur.